**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

THOMAS MCBRIDE,                    :
                                   :
          Plaintiff,               :          Case No. 2:10-CV-05737
                                   :
     v.                            :
                                   :
AMERICAN SUBSTANCE ABUSE           :          HON. EDUARDO C. ROBRENO
PROFESSIONALS, INC., et al.,       :          FILED ELECTRONICALLY
                                   :
          Defendants.              :

**MEMORANDUM OF POINTS**
**AND AUTHORITIES IN SUPPORT OF DEFENDANT**
**NATIONAL DIAGNOSTIC, INC.'S MOTION FOR SUMMARY JUDGMENT**

## I.      BACKGROUND & SUMMARY OF THE ARGUMENT

Defendant National Diagnostics, Inc. ("NDI"), by its undersigned counsel, and pursuant to Federal Rule of Civil Procedure 56(c) and Local Rule 7.1, hereby submits this Memorandum of Points and Authorities in support of its Motion for Summary Judgment.

Plaintiff Thomas McBride (Mr. McBride") brought this negligence action after he tested "positive" for cocaine on a workplace drug test administered by NDI.  He argues that because he does not use cocaine, NDI must have been negligent in the testing process.  A thorough review of the facts has revealed that Mr. McBride's test was in all respects collected, analyzed, and reviewed according to the stringent standards adopted by NDI, Mr. McBride's then-employer, and Mr. McBride's union.  Mr. McBride cannot point to any allegedly wrongful act that would allow a reasonable jury to conclude that his drug test was falsely reported positive for cocaine or that NDI acted negligently in any other respect.

Mr. McBride is a former United Parcel Service ("UPS") "package truck" driver.  In late 2008, Mr. McBride was subject to unannounced workplace follow-up drug testing pursuant to an agreement between Mr. McBride, UPS, and his Union.  On October 30, 2008, Mr. McBride was

notified by UPS to report to a nearby collection site to produce a urine specimen for testing.  He produced a urine sample, which was forwarded by the collection site to a federally certified laboratory for testing.  The test results were positive for cocaine.  Defendant NDI, a third party administrator that provides comprehensive drug testing and Medical Review Officer ("MRO") services, proceeded to review the chain-of-custody documentation related to Mr. McBride's urine specimen,  including the laboratory result, and then had its MRO contact Mr. McBride to discuss the test result.  Mr. McBride spoke with the MRO, who asked Mr. McBride whether he had any legitimate medical explanation for the positive test result.  After considering and rejecting medical explanations for the test result, NDI reported the verified positive result to UPS.  Mr. McBride was terminated from UPS' employment soon thereafter.  Mr. McBride then brought this negligence action against NDI, alleging that because he has never knowingly used cocaine, NDI must have been negligent in administering his drug test and reporting a positive result.  Notably, Mr. McBride's urine sample was tested for drugs in accordance with NDI's contract with UPS, which requires employee drug and alcohol testing to be conducted in accordance with the stringent drug and alcohol testing provisions adopted by the U.S. Department of Transportation ("DOT") for regulated private-sector transportation workers. Approximately 8 million private sector workers are subject to mandatory testing pursuant to those DOT regulations.  Workers who test positive pursuant to those regulations are barred for some time from performing any DOT-regulated safety-sensitive function, so the procedures are detailed and designed to minimize any possibility of error in the testing process.  Given the DOT drug testing regulations' exacting requirements, NDI, UPS, and Mr. McBride's Union clearly agreed upon a reasonable standard of care by which NDI would administer UPS drug and alcohol tests.  It therefore follows that if NDI followed the DOT drug and alcohol testing

procedures in handling Mr. McBride's test, NDI unquestionably acted in a reasonable manner.

Mr. McBride has not in fact directly alleged that the DOT drug and alcohol testing regulations fail to meet the standard of care a reasonably prudent drug test administrator should follow.  Rather, he alleges that NDI may have failed to follow those regulations.  He is wrong. Two federally certified drug testing laboratories independently analyzed the urine sample Mr. McBride provided, and both testing laboratories independently reported that he tested "positive" for cocaine.  NDI performed its role as UPS' drug testing administrator, including its medical review of Mr. McBride's test results, exactly as contemplated by the DOT regulations, pursuant to those standards, and found no error in the tests themselves and no legitimate medical explanation for the positive test results.  Nor did NDI see any evidence of tampering, sloppy recordkeeping, or other malfeasance that would suggest Mr. McBride's test results were unreliable.

The parties have completed discovery and this matter is now ripe for resolution.[1]  Despite engaging in months of discovery, Mr. McBride has adduced no evidence whatsoever to support his claim that NDI acted negligently with respect to his drug test result, and therefore no evidence whatsoever to suggest that NDI's acts proximately caused the harm he claims to have suffered.  Mr. McBride's negligence claim is based on nothing more than his own speculative belief that his "positive" drug test results are inaccurate.  Accordingly, no reasonable fact-finder could conclude that NDI was in any way negligent in the administration of Mr. McBride's drug test, and this Court should grant Defendant's Motion and enter summary judgment for NDI.

---

[1] Mr. McBride originally included UPS, American Substance Abuse Professionals (ASAP) (the entity that coordinated his follow-up testing) and other, unnamed Defendants in this action. UPS was dismissed from the case by Order of this Court dated March 8, 2012.  Mr. McBride voluntarily dismissed ASAP on February 6, 2012.  No other individual defendant was identified or served with notice of Mr. McBride's suit.

## II.   STATEMENT OF UNDISPUTED MATERIAL FACTS

### A.   Mr. McBride Is Employed By UPS and Subject to A Negotiated Drug Testing Policy

In 2008, Mr. McBride worked for United Parcel Service as a "package car" driver.  See excerpts from Deposition of Thomas McBride ("McBride Dep.") at 15:19-21, attached as Exhibit A.  At all relevant times during his employment with UPS, Mr. McBride was a member of the Teamsters Local 623 Union ("Teamsters").  See McBride Dep. at 21:9-16.  Many of the terms and conditions of Mr. McBride's employment were governed by a collective bargaining agreement ("CBA") between the Teamsters and UPS.  These terms included a policy on drug and alcohol use and testing.  See Article 35 excerpt of the Teamsters/UPS Collective Bargaining Agreement, attached as Exhibit B.

During the relevant period, Mr. McBride was subject to drug testing as a condition of employment.  See Article 35 of CBA, Section 3.1 at p. 89; McBride Dep. at 19:12-16.  The CBA contains detailed provisions regarding drug and alcohol testing of employees.  Id.  Of relevance here, the CBA sets out detailed procedures addressing the collection, custody, and evaluation of test specimens pursuant to UPS policy.  UPS's testing procedures are modeled on drug and alcohol testing regulations issued by the DOT for certain regulated transportation workers, ("DOT Regulations", 49 C.F.R. § 40 et seq.) although Mr. McBride was not subject to DOT-mandated testing.  McBride Dep. at 17:20–18:6.  During his employment, Mr. McBride was provided with a copy of UPS's drug testing policy and was familiar with the procedures.  McBride Dep. at 20:17-22.  Mr. McBride estimates that during the course of his employment, he submitted to drug and/or alcohol tests perhaps as many as 20 times.  McBride Dep. at 37:10-15.

### B.   Mr. McBride is Convicted of Driving While Intoxicated and Enters into a Rehabilitation Agreement with UPS

In June 2007, Mr. McBride received a citation for driving his personal vehicle while

intoxicated ("DWI") in New Jersey.  Second Am. Compl. ¶ 10; see also Order and Certification

for Intoxicated Driving and Related Offenses and Notification of Penalties for Subsequent DWI,

attached as Exhibit C.  Mr. McBride then was convicted of driving while intoxicated.  McBride

Dep. at 11:20-12:8.  As a result of his DWI conviction, the State of New Jersey suspended Mr.

McBride's driving privileges in the state for six months.  McBride Dep. at 22:17-23:7.[2]  UPS

learned of Mr. McBride's DWI conviction and required him to enter into an Alcohol and/or Drug

Rehabilitation Agreement.   McBride Dep. at 22:17-24:14; see also UPS/IBT Alcohol and/or

Drug Rehabilitation Agreement dated August 23, 2007, attached as Exhibit D.

Pursuant to the terms of the Rehabilitation Agreement, Mr. McBride agreed to remain

drug- and alcohol-free and voluntarily agreed to submit to a return-to-work alcohol and drug test,

unannounced follow-up alcohol and drug tests as recommended for him by a Substance Abuse

Professional ("SAP"), and aftercare substance abuse treatment.  See UPS/IBT Alcohol and/or

Drug Rehabilitation Agreement dated August 23, 2007.  Mr. McBride acknowledged that failure

to complete rehabilitation, failure to comply with the recommendation of his SAP, or a future

positive test result would result in the termination of his employment.  Id.  Once his SAP

released him to return to work, Mr. McBride took and passed a return-to-work alcohol and drug

test.

### C.    Mr. McBride Tests Positive for Cocaine on a Follow-Up Test

After he returned to work, Mr. McBride was subject to unannounced follow-up alcohol

and drug testing in accordance with his SAP's recommendation.  See McBride Dep. at 26:6-13;

36:23-37:7.  Whenever directed by UPS to do so, Mr. McBride traveled to the Worknet testing

facility located in Lester, Pennsylvania for the testing.  McBride Dep. at 41:9-16.  On October

---

[2] The Order and Certification Form actually states that Mr. McBride's right to drive in New
Jersey was suspended for a seven-month period.

30, 2008, Mr. McBride reported to the Worknet facility for a follow-up drug and alcohol test and provided a urine sample to be tested for drugs.  McBride Dep. at 42:14-17.  On that date, Worknet was busier than usual and it took him longer than he expected to complete the test. McBride Dep. at 43:3-17; 46:18-23.  He did not experience any problem with the collection process, however. McBride Dep. at 46:8-23.

In accordance with UPS policy, Mr. McBride signed a Custody and Control Form at the time he provided his urine sample.  See "Step 5" of Advanced Technology Network Custody and Control Form, attached as Exhibit E.  In the area of the Custody and Control Form that is to be completed by the donor, it states:

> I certify that I provided my urine to the collector; that I have not adulterated it in any manner; each specimen bottle used was sealed with a tamper-evident seal in my presence; and that the information provided on this form and on the label affixed to each specimen is correct.

Id.

NDI does not test urine specimens for UPS.  See excerpts from Deposition of Dr. Elayne Theriault ("Theriault") Dep. at 48:22-49:1, attached as Exhibit F.  Rather, test samples collected pursuant to UPS's contract with NDI are forwarded to a laboratory that performs the drug testing.  After Mr. McBride submitted his urine sample, UPS (acting as the courier) delivered his urine sample to Advanced Technology Network ("ATN") in Memphis, Tennessee.  See Exhibit E; Theriault Dep. at 11:6-10; 12:16-20.  ATN is certified by the Substance Abuse and Mental Health Services Administration ("SAMHSA") to perform federal workplace drug testing, including DOT-mandated tests. Theriault Dep. at 16:19-17:18.  ATN tested Mr. McBride's urine specimen for five different classes of illegal drugs, and concluded that he had cocaine metabolites in his specimen.  See ATN November 3, 2008 Test Results for Mr. McBride,

attached as Exhibit G; Theriault Dep. at 42:9-24.   The test revealed 1,065 ng/ml of benzoylecgonine, a cocaine metabolite, present in Mr. McBride's urine specimen.   Theriault Dep. at 42:9-43:6.  This result was significantly in excess (in fact, more than 700%) of the 150 ng/ml cut-off adopted by the DOT and, therefore, by UPS and the Teamsters.  49 CFR § 40.87; Article 35 of CBA, Sections 3.3-3.4.   ATN, therefore, reported that Mr. McBride's test was "positive" for cocaine.

> **D.   NDI Conducts A Review of Mr. McBride's Drug Test Results And Confirms His Test Is "Positive" For Cocaine**

The results of Mr. McBride's test were forwarded from ATN to NDI on November 3, 2008, pursuant to NDI's contractual agreement to coordinate drug and alcohol testing services, including Medical Review Officer ("MRO") services, for UPS.  Theriault Dep. at 10:9-17; 13:1-2; 17:18-8; 38:2-15.  See NDI/UPS Substance Abuse Testing Services Agreement, attached as Exhibit H.

Pursuant to this contract, NDI's MRO is responsible for reviewing and reporting the results of UPS' employee drug tests to UPS.  See Article 35 of CBA, Section 3.17 at p. 103.  The contract stipulates that NDI will perform these services in accordance with U.S. Department of Health and Human Services ("DHHS") Guidelines and the DOT Regulations.  See Exhibit H at 1; see also Article 35 of CBA, Section 3.17.  The DOT Regulations require laboratories to test samples in accordance with the DHHS Guidelines.  See  49 CFR § 40.81.

The medical review process for a drug test result follows specific protocols per the DOT Regulations.   Initially, the MRO receives all positive and negative drug test reports from the independent laboratory that analyzed the sample or samples submitted.   See 49 CFR § 40, Subpart G, "Medical Review Officers and the Verification Process", attached as Exhibit I.  When a test result for the presence of a specific drug or its metabolite is detected, the MRO must

review the test to determine if there is an alternative medical explanation for the positive test result.  Id. at § 40.129.  To do so, an MRO contacts the donor and offers him the opportunity to discuss with the MRO the positive test result.  If the individual responds, the donor and the MRO may discuss the donor's relevant medical history and relevant biomedical factors.  The MRO reviews all medical records provided by the donor and verifies the accuracy of the laboratory report and assessment.  49 CFR §§ 40.135 – 141 and Article 35 of CBA, Section 3.17 at p. 104.

NDI's standard procedures also require an MRO to review chain of custody[3] forms for completeness and to note any anomalies.  However, provided that the chain-of-custody is intact, an MRO does not, per the DOT Regulations, further investigate how a collection facility has collected a urine sample or how the testing facility has conducted its analysis of a urine specimen.  Theriault Dep. at 13:14-15:2; 25:9-26:2; 50:16-19.

Dr. Elayne Theriault is the NDI MRO who reviewed Mr. McBride's positive drug test result.  Theriault Dep. at 26:7-10.  Dr. Theriault has over 25 years of experience as an MRO and is certified by the American Association of Medical Review Officers (AAMRO).  See Affidavit of Elayne Theriault at ¶ 1 attached as Exhibit J.  Over the course of her career as an MRO, Dr. Theriault has conducted thousands of MRO reviews.  Theriault Dep. 45:19-25.

Upon receipt of Mr. McBride's urine sample, Dr. Theriault reviewed the related documentation which established that a collector working at Worknet signed the chain-of-custody form certifying that Mr. McBride's urine specimen was collected, labeled, sealed, and released to ATN in accordance with applicable requirements.  Theriault Dep. at 22:3-18; ATN Custody and Control Form, attached as Exhibit E.  Similarly, Dr. Theriault reviewed the test results from ATN, which were signed by a certifying scientist, which indicated that Mr.

---

[3] The term "chain of custody" refers to documentation of all handling of a donor's urine specimen.

McBride's urine sample was examined, handled, analyzed and reported by American Toxicology Network in accordance with applicable testing requirements.  Theriault Dep. at 21:9-12; Exhibit G (ATN Test Results).

After NDI was satisfied that the documentation was complete, Dr. Theriault contacted Mr. McBride on November 5, 2008 to discuss his positive drug test results.  See excerpt from Deposition of Tara Male at 5:13-17, attached as Exhibit K; McBride Dep. at 58:6-59:8; Theriault Dep. at 26:11-12.  Dr. Theriault interviewed Mr. McBride by telephone and asked him for information that might explain the positive test result.  McBride Dep. at 59:3-8; Theriault Dep. at 27:1-14.  NDI's MRO Assistant, Tara Male, also participated in the telephone interview of Mr. McBride for the purpose of taking notes during the interview.  Those notes were afterwards input into NDI's electronic system and recorded on an MRO Verification Interview Worksheet. Theriault Dep. at 26:13-27:14; Male Dep. at 5:13-17;  MRO Verification Interview Worksheet, attached as Exhibit L.

During their conversation, Mr. McBride informed Dr. Theriault that he had undergone a dental procedure five days before his October 30, 2008 drug test.  In response to Dr. Theriault's question, Mr. McBride also stated that it was possible that someone could have slipped cocaine into his food or drink.  Theriault Dep. at 27:15-22.  Mr. McBride did not disclose to Dr. Theriault that during his dental procedure he was administered a local anesthesia that contained Septocaine.  McBride Dep. at 33:6-34:10.  Ms. Male also recorded that Mr. McBride informed Dr. Theriault that he had not used cocaine in the months prior to his October 30, 2008 drug test. See Exhibit L, MRO Verification Interview Worksheet.  Mr. McBride, however, denies that he has ever knowingly used cocaine.  Second Am. Compl. ¶ 19; McBride Dep. at 85:15-16.

Dr. Theriault considered and ruled out the explanations offered by Mr. McBride as possible legitimate explanations for the positive drug test result.  She testified that even if Mr. McBride had used cocaine several months prior to his October 30, 2008 drug test, he would not have tested positive for cocaine in October 2008.  Theriault Dep. at 28:7-13.  Dr. Theriault also determined that even if Mr. McBride lawfully ingested cocaine during a dental procedure five days before his drug test, it would not have produced a positive drug test result for cocaine because the cocaine metabolite can be detected in urine for no more than 72 hours after the cocaine use.  Theriault Dep. at 28:14-18; Theriault Affidavit at ¶ 8.  Furthermore, even had Mr. McBride unknowingly ingested cocaine within the 72 hours of his drug test, pursuant to the DOT Regulations – and, by extension, UPS policy – Dr. Theriault still would have reported the test as positive, because unknowing use is not a legitimate medical explanation for a positive result. Theriault Dep. at 29:16-18; see also 49 C.F.R. §40.151.  Mr. McBride did not report taking any other medication prior to his drug test, and Dr. Theriault concluded that even if he had taken some type of medication prior to his drug test, there is no medication that would have caused a positive cocaine test result.   McBride Dep. at 84:9-12; Theriault Dep. at 29:23-30:7.   In accordance with DOT Regulations, Dr. Theriault therefore verified Mr. McBride's drug test result as "positive" for cocaine and NDI reported that result to UPS.  Theriault Dep. at 28:23-29:18.

### E.   Mr. McBride's Urine Sample is Sent to Another Certified Laboratory and Again Tests "Positive" for Cocaine

Pursuant to policy and in accordance with the DOT Regulations, Mr. McBride then was offered the opportunity to have a portion of the urine specimen he provided on October 30, 2008 re-tested by a second certified laboratory to ensure that the original test was accurate.  Mr. McBride asked for the confirmatory re-test to be conducted.  McBride Dep. at 59:10-15;

Theriault Dep. at 34:19-24. Therefore, NDI directed ATN to forward Mr. McBride's specimen to a second laboratory for re-testing. See Letter to ATN dated November 10, 2008, attached as Exhibit M. On November 24, 2008, Laboratory Corporation of America ("LabCorp"), also a SAMHSA-certified laboratory, conducted a re-test of Mr. McBride's urine specimen. The results of LabCorp's testing were that Mr. McBride's urine specimen again tested "positive" for cocaine metabolite. Theriault Dep. at 34:19-35:21; see LabCorp Test Result, attached as Exhibit N. After Mr. McBride's positive test was reconfirmed by LabCorp, NDI informed Mr. McBride that his test was again positive for cocaine. Theriault Dep. at 36:1-5. NDI also reported the confirmatory re-test result to UPS. See Theriault Dep. at 47:23-48:3-5; Letter dated November 26, 2008 from NDI to UPS, attached as Exhibit O.

### F. UPS Terminates Mr. McBride's Employment

On November 5, 2008, Mr. McBride, his Union Business Agent, and his UPS supervisor and manager participated in a meeting in which Mr. McBride's supervisor and manager informed him that his drug test results were positive. McBride Dep. at 49:18-50:3. Mr. McBride's supervisor and manager terminated his employment during the meeting. McBride Dep. at 50:1-3. In a letter dated November 12, 2008, UPS also informed Mr. McBride in writing that his employment was being terminated because he violated the terms of his rehabilitation agreement. Id. Other than providing its MRO results to UPS, NDI did not participate in any way in UPS's termination decision.

### G. Mr. McBride Suggests Septocaine Caused His Positive Test

After UPS terminated his employment, Mr. McBride contacted his dentist and asked what drugs were administered to him during the October 25, 2008 dental procedure. McBride Dep. at 52:7-13. Mr. McBride's dentist informed him that he had administered Septocaine, a local

anesthesia, during Mr. McBride's dental appointment.   McBride Dep. at 51:11-53:11.   Mr. McBride obtained a note from his dentist regarding the dentist's use of Septocaine and provided the note to UPS and the Teamsters.   Id.   Notably, Mr. McBride's dentist did not tell him that Septocaine could cause a positive test result for cocaine.   McBride Dep. at 53:15-18.

Mr. McBride admits that he has no knowledge of whether Septocaine can cause a false positive test for cocaine, and Mr. McBride has not offered any expert testimony or other authority in support of his bold allegations.   Mr. McBride also has not challenged the chain-of-custody of the drug test specimen he provided on October 30, 2008.   McBride Dep. at 32:19-33; 53:21-54:9.   Nevertheless, on November 24, 2008, the Teamsters appealed Mr. McBride's discharge.   See Letter from George Ruggieri to UPS dated November 24, 2008, attached as Exhibit P; McBride Dep. at 50:4-8.   UPS, however, rejected Mr. McBride's grievance.   McBride Dep. at 56:18-20.   Mr. McBride subsequently brought this action against NDI, UPS and others. NDI is the only remaining defendant, and this matter is now ripe for summary disposition.

## III.   STANDARD OF REVIEW

Federal courts are directed to grant summary judgment against a party who fails to offer admissible evidence sufficient to establish the existence of every element essential to that party's case and on which that party bears the burden of proof.   Fed. R. Civ. Pro. 56; Celotex Corp. v. Catrett, 477 U.S. 317, 322, 327 (1986) (the "[s]ummary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed 'to secure the just, speedy and inexpensive determination of every action'") (internal citation omitted).   Although a defendant seeking summary disposition bears the initial responsibility of asserting the basis for its motion, the defendant is not required to negate the plaintiff's claim.   Rather, the defendant must only point out that there is an absence of

evidence to support the plaintiff's case or, alternatively, offer affirmative evidence which demonstrates that the plaintiff cannot prove his or her case.  Sovereign Bank v. BJ's Wholesale Club, Inc., 533 F.3d 162, 171 (3d Cir. 2008); Lawrence v. Nat'l Westminster Bank N.J., 98 F.3d 61, 69 (3d Cir. 1996).

After the movant has met its initial burden, to avoid summary judgment, the non-moving party must produce specific facts demonstrating that there is a genuine issue for trial as to the factual elements essential to the non-moving party's case.  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).  Although the court is to view the evidence in a light favorable to the non-moving party, the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986).  Rather, the requirement is that there be no genuine issue of material fact.  Id.; Charlton v. Paramus Bd. of Educ., 25 F.3d 194, 197 (3d Cir. 1994), cert. denied, 513 U.S. 1022 (1994).  A disputed fact is not "material" unless its resolution could affect the outcome of the case, and a disputed fact is not "genuine" unless the evidence bearing on the disputed fact is such that a reasonable person could find for the non-moving party.  Sosky v. Int'l Mill Serv., Inc., No. 94-2833, 1996 U.S. Dist. LEXIS 791, at *7-8 (E.D. Pa. Jan. 25, 1996), aff'd, 103 F.3d 114 (3d Cir. 1996) (citing Anderson, 477 U.S. at 248).

To survive a summary judgment motion, therefore, the non-moving party cannot merely rely upon allegations made in the pleadings.  Fed. R. Civ. P. 56(e); Celotex, 477 U.S. at 324.  Rather, the non-moving party must offer "concrete evidence from which a reasonable [fact finder] could return a verdict in his favor."  Anderson, 477 U.S. at 256; Berckeley Inv. Group, Ltd. v. Colkitt, 455 F.3d 195, 201 (3d Cir. 2006); Lexington Ins. Co. v. W. Pa. Hosp., 423 F.3d 318, 333 (3d Cir. 2005).

Under Pennsylvania law, "'[t]he determination of whether an act or failure to act constitutes negligence, of any degree, in view of all the evidence has always been particularly committed to determination by a jury,'" and the question of whether a duty of care has been breached is therefore one "'that may be removed from consideration by a jury and decided as a matter of law only where the case is entirely free from doubt and there is no possibility that a reasonable jury could find negligence.'" <u>Snead v. SPCA of Pa.</u>, 929 A.2d 1169, 1183 (Pa. Super. Ct. 2007) (<u>quoting</u> <u>Bloom v. Dubois Reg'l Med. Ctr.</u>, 409 Pa. Super. 83, 597 A.2d 671, 679-80 (Pa. Super. Ct. 1991)) (internal citations omitted).   Because Mr. McBride has adduced no evidence whatsoever of malfeasance in the testing process, this is just such a case.

No genuine dispute of material fact exists with respect to Mr. McBride's claim of negligence against NDI.   Mr. McBride admits that he is unaware of any specific flaw in the testing process, and disputes only the outcome.   Mr. McBride cannot rely upon his counsel's unsupported and conclusory allegations, but must produce "concrete evidence" that would permit a reasonable jury to conclude that NDI negligently administered his drug test.   The record is devoid of such evidence.   Consequently, NDI is entitled to an award of summary judgment in its favor.

## IV.   <u>ARGUMENT</u>

To prevail on a negligence claim in Pennsylvania, a plaintiff must establish: (1) a duty recognized by law requiring the defendant to conform his or her conduct to a certain standard of care; (2) a breach of that standard of care; (3) a causal connection between the breach and the resulting injury; and (4) actual damage to the plaintiff.   <u>Farabaugh v. Pa. Tpk. Comm'n</u>, 590 Pa. 46, 911 A.2d 1264, 1272-73 (Pa. 2006).   Mr. McBride relies upon <u>Sharpe v. St. Luke's Hospital</u>, 821 A.2d 1215 (Pa. 2003), for the general proposition that a third-party drug test provider can be held responsible for negligence in the administration of workplace drug testing.   However, Mr.

McBride has produced no evidence demonstrating any breach by NDI of its applicable duty of care, rather, the undisputed facts here demonstrate that NDI acted with reasonable care at all times (and even in accordance with heightened DOT Regulation standards), and is not the proximate cause of Mr. McBride's alleged injuries.

A.   **NDI Acted With Reasonable Care At All Times With Respect To Mr. McBride's Drug Test.**

A duty of care is "an obligation to which the law will give recognition and effect, to conform to a particular standard of conduct toward another." Atcovitz v. Gulph Mills Tennis Club, Inc., 571 Pa. 580, 812 A.2d 1218, 1222 (Pa. 2002). The concept of duty of care is rooted in public policy considerations and is ultimately an issue of fairness. Id.; Petrongola v. Comcast-Spectacor, L.P., 789 A.2d 204, 210 (Pa. Super. Ct. 2001). Under Pennsylvania law, the existence of a duty of care is predicated on the relationship between the plaintiff and the defendant and arises only when a defendant "engages in conduct which foreseeably creates an unreasonable risk of harm" to a particular plaintiff. Petrongola, 789 A.2d at 210; Markovich v. Bell Helicopter Textron, Inc., 805 F. Supp. 1231, 1236 (E.D. Pa. 1992). Pennsylvania has recognized that a drug testing provider may owe a duty of care to tested individuals. Sharpe, 821 A.2d at 1219-21.

Relying on Sharpe, Mr. McBride alleges that NDI had a duty of care to ensure the accuracy of his drug test and the reporting of his results to UPS, and that NDI knew or should have known that errors in processing or reporting the results of Mr. McBride's drug test could negatively affect his employment. Second Am. Compl., at ¶¶ 26-27. Although there are no doubt many responsible approaches to implementing a workplace drug testing program, the drug and alcohol testing regulations adopted by the DOT in response to the Congressional mandate of the Omnibus Transportation Employee Testing Act of 1991 are unquestionably regarded as responsible. See DOT Regulations, 49 C.F.R. § 40 et seq.. In fact, these regulations, first

adopted in 1991 after notice and comment and regularly updated thereafter, govern the testing process for an estimated 8 million private sector transportation workers and have survived numerous challenges in the federal courts.   See, e.g., BNSF Ry. Co. v. United States Dep't of Transp., 566 F.3d 200, 204-05 (D.C. Cir. 2009) (rejecting challenge to the reasonableness of DOT regulations requiring direct observation of return to work and follow-up drug tests); Int'l Bhd. of Teamsters v. Fed. Highway Admin., 56 F.3d 242 (D.C. Cir. 1995) (holding that DOT alcohol testing procedures were reasonable and that the regulations adopted the appropriate safeguards and nondiscriminatory methods required by the Omnibus Transportation Employee Testing Act of 1991).   In addition, the United States Supreme Court has consistently acknowledged that the underlying drug testing methods since adopted by the DOT, and applied in this case, are reliable.   Skinner v. Ry. Labor Executives' Ass'n, 109 S. Ct. 1402, 1409 n. 3 (1989) (noting that "positive" drug tests that are confirmed by properly conducted gas chromatography/mass spectrometry tests "identify the presence of alcohol and drugs in the biological samples tested with great accuracy"); Nat'l Treasury Employees Union v. Von Raab, 489 U.S. 656, 672 n. 2 (1989) ("the combination of EMIT and GC/MS tests required by the Service is highly accurate, assuming proper storage, handling, and measurement techniques").

NDI and UPS agreed that NDI would test all samples in accordance with the DHHS guidelines, as well as other applicable federal regulations for federally mandated and voluntary drug testing programs.   See NDI/UPS Substance Abuse Testing Services Agreement at p. 1, attached as Exhibit H.   Mr. McBride, through the Teamsters, also agreed that tests be conducted in accordance with the DOT Regulations.   See Article 35 of the CBA, Sections 3-3.1.   Mr. McBride has not alleged or even suggested that the DOT testing protocols adopted by NDI, UPS and the Teamsters are legally insufficient to meet Pennsylvania's demand that drug tests be

conducted with reasonable care.  The legal issue presented here, therefore, is whether NDI in fact acted according to the reasonable standards of care adopted by the parties.

Mr. McBride has alleged that NDI's potentially negligent conduct includes:

- Failure to ensure a proper chain of custody of the subject specimen(s);

- Failing to communicate with Plaintiff and the testing facility(ies) any and all factors and/or agents which could or did affect the testing, including but not limited to Plaintiff's pre-test dental procedure and related use of Septocaine;

- Failure to take into account and eliminate any and all factors and/or agents which may improperly influence the test(s), including, but not limited to Septocaine;

- Failure to prevent testing results of and/or reporting of a "false-positive";

- Failure to pre-test interview Plaintiff to rule out abnormalities which could and/or did influence the test(s);

- Failure to maintain and/or cause to be maintained appropriate quality control testing and/or reporting mechanisms and/or protocols;

- Failure to comply with governing procedures, regulations, protocols, and/or laws concerning reporting and/or testing; and/or

- Failure to monitor and/or control others' compliance with the aforesaid.

Second Am. Compl., Pages 4-5.

However, it is clear from the record that Mr. McBride has not, because he cannot, adduce any evidence in support of his claims.  Initially, Mr. McBride suggests that NDI may not have ensured a "proper chain-of-custody" of his specimens.  However, when asked at his deposition whether he experienced anything in the October 30, 2008 collection process that led him to conclude that his sample might have been mishandled, Mr. McBride, who had submitted to an estimated 20 urine collections, stated only that "there was a lot of chaos in [the Worknet collection facility] and different people coming in and out" and that the test took longer than usual.  McBride Dep. at 35:10-36:14; 43:3-17; 46:18-23.  McBride Dep. at 37:10-15.  Mr.

McBride did not communicate any of his purported misgivings concerning the environment of the collection facility to Dr. Theriault, or, as far as the record shows, to anyone prior to filing his Second Amended Complaint.   To the contrary, at the time of the collection, Mr. McBride verified with his signature that the test specimen attributed to him was collected from him and sealed with tamper-evident tape in his presence before being packaged and sent to ATN for testing.  See ATN October 30, 2008 Custody and Control Form.

As the assigned MRO, Dr. Theriault conducted a detailed review of the documentation related to Mr. McBride's drug test results, as she always does before conducting with a donor the MRO review of a laboratory's test results.  Dr. Theriault confirmed that the chain of custody for Mr. McBride's urine specimen was maintained from the time that it was collected at the Worknet facility to the time that ATN received his urine specimen at its testing laboratory and accessioned the sample for testing.   Later, the remainder of that sample was sent directly from ATN to LabCorp for a second confirmatory test at Mr. McBride's request.   The documentation of the sample's movement through each step of the process is clear and complete.   Theriault Dep. at 13:14-14:6; 21:6-12.   In sum, Mr. McBride can point to no evidence that might show an improper collection or handling of his urine specimen between the time of collection and the reported results.

Turning to Mr. McBride's other theories of what might have happened, once NDI gathered and Dr. Theriault reviewed the documentation related to Mr. McBride's test, NDI contacted Mr. McBride for the express purpose of determining if there could be a legitimate medical explanation for the presence of cocaine metabolites in his urine specimen.   Again, the MRO interview is NDI standard procedure for UPS test results and was conducted in accordance with DOT regulations.  See 40 CFR § 40, Subpart G.  During his interview, Mr. McBride failed

18

to offer any information that might suggest a legitimate medical explanation for his positive test result.  Mr. McBride told Dr. Theriault that he had received dental care five days prior to his drug test and that he may have ingested food or drink that contained cocaine without his knowledge.  Dr. Theriault, drawing upon her extensive experience as an MRO, concluded that neither explanation could serve as a legitimate medical excuse for his positive drug test result - and Mr. McBride has offered no evidence to the contrary.  Dr. Theriault was well aware that Mr. McBride's positive test result could only be explained by the use of cocaine, within 72 hours of the drug test.  Theriault Dep. at 29:16-18, see also U.S. HHS MRO Manual, attached for convenience as Exhibit Q.  The undisputed record evidence, moreover, shows that Mr. McBride did not disclose his use of Septocaine to Dr. Theriault during his interview.  Yet, even had he done so, the result would have been the same.  Septocaine cannot be metabolized into benzoylecgonine, the cocaine metabolite in Mr. McBride's urine specimen.  Theriault Aff. at ¶ 11; see also U.S. HHS MRO Manual  (stating that topical anesthetics, such as Septocaine have no structural similarity to cocaine and therefore, cannot cause a positive test result for the presence of benzoylecgonine in urine specimen).  Mr. McBride has offered no medical authority or expert testimony to the contrary, because he simply cannot.

It is true in the abstract that the medical use of cocaine (rather than Septocaine) could cause a positive test – but only if the cocaine is administered within 72 hours before the urine collection.  Theriault Aff. at ¶ 8.  If Mr. McBride had undergone a dental procedure that included cocaine five days prior to his test, his test result would nonetheless have been negative, because cocaine metabolites can only be detected in urine for a 72-hour period.  Id.  In short, the dental appointment occurred too far in the past for it to have had any relevance to Mr. McBride's positive test result, and Mr. McBride has failed to produce any authority to the contradict this

medical reality.   In any event, Mr. McBride was not administered any cocaine as part of that procedure.

After the MRO review, and in accordance with DOT Regulations, Mr. McBride was provided with the opportunity to have his urine specimen re-tested by a second SAMHSA-certified testing laboratory, to eliminate any concerns he might have that the laboratory made a mistake in the testing process.   The second test of his specimen, conducted by LabCorp, also confirmed that Mr. McBride's urine specimen tested "positive" for cocaine.   Exhibit N, LabCorp Test Result.

NDI, therefore, did not, as alleged, "fail to communicate" with Mr. McBride and the testing facilities any and all factors which could or did affect the testing, including but not limited to Plaintiff's pre-test dental procedure and related use of Septocaine.   Nor did NDI fail to "take into account and eliminate any or all factors or agents which may improperly influence the test(s), including, but not limited to, Septocaine."   Dr. Theriault and NDI ensured that Mr. McBride's test was conducted and reviewed using proper quality control and reporting mechanisms, and followed "governing" procedures, regulations, protocols, and laws concerning the reporting of his test results to UPS.   The MRO Manual published by HHS to assist MROs in interpreting drug test results explicitly addresses and rejects the arguments Mr. McBride has made in support of his claim.   See Exhibit Q, U.S. HHS MRO Manual  at 14, 39. In contrast, Mr. McBride has not offered any explanation that would allow a finder of fact to reach another conclusion – no expert testimony, no lay testimony, no theory – to suggest that Septocaine can cause a false "positive" result for cocaine or that he was legitimately exposed to cocaine.

Plaintiff has failed, therefore, to allege a single fact to support his claims that NDI did not ensure that his test was conducted in accordance with the UPS policy and the DOT Regulations,

or was not otherwise performed in a reasonable manner.  Nor has he alleged that NDI overlooked a legitimate medical explanation that would justify disregarding a laboratory's confirmed "positive" test result.  Absent specific, admissible evidence of wrongdoing, there is simply no basis for a reasonable jury to find that NDI was negligent in its administration of Mr. McBride's drug test.  Summary judgment should be granted accordingly.

**B.      Requiring A Medical Interview Of An Individual Before Conducting A Suspicionless Drug Test Would Be Bad Public Policy.**

Finally, Mr. McBride alleges that NDI may have acted negligently because it did not conduct, and should have conducted, "pre-test interviews to rule out abnormalities in the testing process."   Such a pre-test interview is not contemplated by the DOT regulations or NDI's contract with UPS.  See generally, 49 CFR § 40 et seq. and Exhibit H.  In any event, a pre-test medical interview is not, in fact, a generally useful tool in a workplace drug and alcohol testing program.   The Americans with Disabilities Act requires that employers not make medical inquiries of employees unless the inquiries are both job-related and consistent with business necessity.   42 U.S.C. § 12112(4)(a).   The Equal Employment Opportunity Commission's Guidance on Pre-Employment Medical Inquiries specifically addresses the Agency's opinion on when an employer may ask employees about the use of medication in the context of workplace drug testing.  That Guidance states:

> * May an employer ask applicants about their lawful drug use if the employer is administering a test for illegal use of drugs?

> > Yes, if an applicant tests positive for illegal drug use.  In that case, the employer may validate the test results by asking about lawful drug use or possible explanations for the positive result other than the illegal use of drugs.

> > Example:  If an applicant tests positive for use of a controlled substance, the employer may lawfully ask questions such as, "What medications have you taken that might have resulted in this

positive test result?  Are you taking this medication under a lawful prescription?"

http://www.eeoc.gov/policy/docs/preemp.html (last visited on April 19, 2012).

Employers are even more limited in the medical inquiries they may make of existing employees pursuant to the Americans with Disabilities Act.  See, e.g., Roe v. Cheyenne Mountain Conference Resort, 124 F.3d 1237 (10th Cir. 1997) (employer's policy requiring its employees to report use of any drug was not job-related and consistent with business necessity, and therefore violated the Americans with Disabilities Act).  A prudent employer, therefore, may choose to ask an employee about the lawful use of medication only after the employee has tested positive.

In this case, NDI was acting at the request of UPS, McBride's employer, to implement a suspicionless drug test.  NDI had no reason to conduct a pre-test medical interview of Mr. McBride, and no such interview is permitted or required under the DOT Regulations which, as previously noted, were to be followed under the operative CBA between UPS and the Teamsters. Moreover, it is utterly unclear what benefit Mr. McBride would have gleaned from a pre-test medical interview that he did not get from NDI's post-test MRO review.

Mr. McBride's cause of action relies upon the Pennsylvania Supreme Court's conclusion that there is social utility in requiring entities that conduct drug tests to act with reasonable care in the conduct of workplace drug test results.  Sharpe, 821 A.2d  at 1220-21.  A pre-test medical examination would not advance this goal and would in fact collide with the federal policy concerns that treat medical information as presumptively not open to inquiry absent a job-related and necessary business reason.  Mr. McBride cannot credibly argue that NDI should have conducted a pre-test medical interview as part the UPS drug testing program, and this Court should decline his implicit invitation to recognize such a duty.

22

C.   **NDI's Conduct in Reviewing and Reporting McBride's Drug Test Results Did Not Proximately Cause His Injuries.**

Under Pennsylvania law, a "proximate cause" is defined as "that which, in a natural and continuous sequence, unbroken by an efficient intervening cause, produces the [plaintiff's] injury." Noon v. Knavel, 339 A.2d 545, 557 (Pa. Super. Ct. 1975).  Proximate causation is established when a defendant's wrongful conduct is a "substantial factor in bringing about the specific harm incurred." Gutteridge v. A.P. Green Servs., Inc., 804 A.2d 643, 655 (Pa. Super. Ct. 2002).  Whether a defendant's conduct was a substantial factor in causing a plaintiff's injury is "ordinarily a question of fact for the jury." Id.  However, the existence of proximate cause may be resolved by the court "where the proposed chain of causation is so attenuated, so dependent upon unprovable contingencies, that the plaintiff is not within the group of individuals properly able" to hold the defendant liable. Marks v. Reserve at Hershey Meadows, 2007 U.S. Dist. LEXIS 47325, at *19-22 (E.D. Pa. June 29, 2007) (internal citation omitted) (granting summary judgment where plaintiff failed to establish that defendant was the proximate cause of her injuries in a negligence action).

Mr. McBride alleges that his positive drug test result is inaccurate and that there must have been some error in the testing process because he has never used cocaine.  Furthermore, Mr. McBride claims that NDI's reporting of his alleged inaccurate positive test result caused him to sustain injuries.  However, Mr. McBride has utterly failed to identify a single instance in which NDI's conduct departed even slightly from the procedures UPS asked NDI to follow and which themselves are objectively reasonable.

In this regard, this case is distinguishable from Sharpe, in which the plaintiff alleged, *inter alia*, that the Hospital that conducted her drug test had a duty of care to perform specimen collection "in accordance with the Code of Federal Regulations governing specimen collection"

and "numerous instances in which the Hospital's actions allegedly did not conform to these standards of care." Sharpe, 821 A.2d at 1217 (emphasis added). In contrast, Mr. McBride has alleged generally that NDI has failed to act reasonably, but has not made a single specific allegation that NDI failed to follow any specific regulation or failed to take any requisite affirmative action in handling his test.

Mr. McBride's claim that NDI caused his alleged injuries is solely based on "unprovable contingencies" for which NDI cannot be held liable. Mr. McBride concedes that he has no personal knowledge that Septocaine can cause a "false positive," and he has presented no testimony that suggests that in fact the drug can metabolize into benzoylecgonine or any other form that might lead to a false positive result. Septocaine cannot cause a positive test result for cocaine. Theriault Aff. at ¶ 11; see also U.S. HHS MRO Manual at 14, 39. How then could NDI's rejection of Septocaine as a legitimate medical explanation cause him to sustain injuries?

The only explanation for the presence of cocaine metabolites in Mr. McBride's urine specimen – which presence was confirmed by two independent SAMHSA-certified laboratories – was his direct or indirect consumption of cocaine. Of course, neither the DOT regulations, the UPS CBA, nor any other authority recognize the unknowing ingestion of an illegal drug as reason to declare a positive test anything but positive. The DOT Regulations provide:

> It is not [the MRO's] function to consider explanations of confirmed positive . . . test results that would not, even if true, constitute a legitimate medical explanation. For example, an employee may tell you that someone slipped amphetamines into her drink at a party, that she unknowingly ingested a marijuana brownie . . . Even if true, such stories do not present a legitimate medical explanation. Consequently, you must not declare a test as negative based on an explanation of this kind.

49 C.F.R. § 40.151(d).

In light of these facts, no reasonable juror could conclude that either NDI's medical review of Mr. McBride's sample or its report to UPS that the tests administered were "positive"

could be the proximate cause of Mr. McBride's termination from employment and alleged,

related injuries.

## V.    <u>CONCLUSION</u>

For the foregoing reasons, National Diagnostics, Inc. asks that this Court grant its Motion for Summary Judgment and dismiss Thomas McBride's Second Amended Complaint with prejudice.  On this record, there is no reason to burden the sources of the parties or the Court with a costly and time-consuming trial.


Dated:  April 23, 2012                              Respectfully submitted,

                                                    LITTLER MENDELSON, P.C.


                                        By:    /s/ Nancy N. Delogu
                                               Nancy N. Delogu (admitted *pro hac vice*)
                                               Megan N. Tumi
                                               1150 17th Street N.W., Suite 900
                                               Washington, DC  20036
                                               Telephone: 202.842.3400
                                               Facsimile: 202.842.0011
                                               nndelogu@littler.com
                                               mtumi@littler.com


                                               /s/ Robert C. Drake
                                               Robert C. Drake (PA ID No. 57177)
                                               LITTLER MENDELSON, P.C.
                                               Three Parkway
                                               1601 Cherry Street, Suite 1400
                                               Philadelphia, PA  19102.1321
                                               rcdrake@littler.com


                                               Counsel for Defendant
                                               National Diagnostics, Inc.