# EXHIBIT A

**Thomas McBride**

Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF PENNSYLVANIA

- - -

THOMAS McBRIDE              :   Civil Action
                           :
    v.                     :
                           :
AMERICAN SUBSTANCE ABUSE   :
PROFESSIONALS, INC.; and   :
NATIONAL DIAGNOSTICS, INC.; :
and JOHN DOES 1-10         :   No. 2:10-cv-05737


- - -

Friday, February 3, 2012

- - -

Deposition of THOMAS E. McBRIDE, taken at the
law offices of Gerolamo, McNulty, Divis & Lewbart, North
American Building, Suite 1400, 121 South Broad Street,
Philadelphia, Pennsylvania 19107, on the above date,
beginning at 1:25 p.m., before Brad Tratenberg, Court
Reporter and Notary Public.

- - -


THOMAS G. OAKES ASSOCIATES

National Court Reporting &

Litigation Support Services

Phone: 1.877.OAKES.77    FAX: 1.856.869.0612

Thomas McBride

Page 11

1   **A**        **My girlfriend, fiancee.**

2   Q        And how long have you lived with Miss Maitlin?

3   **A**        **Approximately a year.**

4   Q        And have you been married in the past?

5   **A**        **I have.**

6   Q        And to whom?

7   **A**        **Donna Gilberti.**

8   Q        And how long were you married, about, to Miss

9   Gilberti?

10  **A**        **I was married for 12 years.**

11  Q        And what dates?

12  **A**        **Actually, I was married for 12 and then I was**

13  **separated and recently was divorced, approximately a**

14  **year.**

15  Q        So you were married to Miss Gilberti around the

16  time of the events that are raised in this case?

17  **A**        **Yes.**

18  Q        Do you have any children?

19  **A**        **No.**

20  Q        Have you ever been convicted of a felony?

21  **A**        **I don't think so.  I've had a DUI.  Is that a**

22  **felony?**

23  Q        I don't know.  I could ask you about it.  You

24  were convicted of a DUI?

Thomas McBride

Page 12

```
 1   A        Yes.

 2   Q        And when was that?

 3   A        That was, I believe, '07.  Summer of '07, I

 4   believe.

 5   Q        That's your best recollection?

 6   A        Yes.

 7   Q        And where and when did that occur?

 8   A        That was in New Jersey.

 9   Q        And were there any other misdemeanors or felony

10   convictions that you can remember?

11   A        No.

12   Q        Any arrests that did not lead to conviction?

13   A        No.

14   Q        Have you ever filed for bankruptcy?

15   A        No.

16   Q        What's your highest level of education?

17   A        High school diploma.

18   Q        Where did you go?

19   A        Interboro High School.

20   Q        And did you graduate?

21   A        Yes.

22   Q        And when was that?

23   A        1988.

24   Q        Did you take any classes after graduating from
```

Thomas McBride

Page 15

1    Q      What kind of route did you have?

2    **A      Residential route.**

3    Q      Residential delivery?

4    **A      At first, yes.**

5    Q      This is when you first started?

6    **A      Yes.**

7    Q      And did that change at some point?

8    **A      Yes, I was commercial, downtown.**

9    Q      And do you remember about when that happened?

10   **A      Approximately 1995.**

11   Q      And during your employment at UPS, were you

12   really driving a package car the entire time?

13   **A      Was I really driving a package car?**

14   Q      I'm sorry, let me clarify.  The "really" wasn't

15   helpful, was it?  Did you drive a package car as your

16   primary job responsibility for the time you were

17   employed at UPS?

18   **A      The entire time, no.**

19   Q      So what other types of work did you do for UPS?

20   **A      I was a package handler from '88 to '91.  '91**

21   **on, I was a package car driver.**

22   Q      What does a package handler do?

23   **A      Sorts packages, loads packages, unloads**

24   **packages.**

Thomas McBride

Page 16

1    Q        Is that something that happens at a warehouse?

2    **A        Yes.**

3    Q        Where was that?

4    **A        I started in West Chester in '88 and moved to**

5    **the airport when that building opened up.**

6    Q        When did you become a package truck driver?

7    **A        They came to me and asked me on my seniority**

8    **date.  I had showed interest in becoming a driver and my**

9    **seniority date came up and they brought me in for**

10   **full-time.**

11   Q        And at that time, did you receive any training?

12   **A        Yes.**

13   Q        Can you remember what kind of training you

14   received?

15   **A        On-the-road training, it was.**

16   Q        When you say on-the-road, do you mean how to

17   drive or how to deliver?

18   **A        Yes, they showed you how to properly -- UPS's**

19   **way of delivering.  Go through the truck and it's loaded**

20   **in certain sections.  So they would take you out, show**

21   **you the route, show you how to deliver, all the safety**

22   **methods, all the safe driving methods.**

23   Q        Now, do you know whether your position at UPS

24   as a package truck driver was a Department of

Thomas McBride

Page 17

1    Transportation regulated position?

2   **A**       **Yes.**

3   Q       What does that mean?  What sorts of

4   regulations?

5   **A**       **Every couple years or few years, I would have a**

6   **physical redone.  And that's it.**

7   Q       So it's a DOT-mandated physical every few

8   years?

9   **A**       **Yes.**

10   Q       And are there any training requirements that

11   came with that that you're aware of, DOT requirements?

12   **A**       **I don't understand.**

13   Q       Any other DOT requirements that you're aware of

14   other than getting a physical?

15   **A**       **They take a urine.  They do your eyesight, your**

16   **weight, height.  Just a regular physical, I guess.**

17   Q       And did you receive training in any Department

18   of Transportation regulations about safe driving?

19   **A**       **No.**

20   Q       And do you happen to know whether that package

21   truck driver position is covered by DOT drug and alcohol

22   testing rules and regulations?

23   **A**       **I'm not sure.  You mean do they check also, the**

24   **DOT?**

Thomas McBride

1    Q        No.  And I think you may have answered my

2    question by not being sure.  But at any time, were you

3    informed that drug and alcohol tests or drug and alcohol

4    rules applied to your position and that those rules were

5    mandated by the U.S. Department of Transportation?

6    A        I'm not sure.

7    Q        Let's step back a little bit.  If you remember,

8    what was your salary at the time you were hired?

9    A        As a part-time employee when I was first hired?

10   Q        If you remember it.

11   A        Approximately $8.50, I think, something like

12   that.

13   Q        And did that change when you became a full-time

14   driver?

15   A        Yes.

16   Q        What did it go to?

17   A        I'm not definite.  I think it was maybe 17 or

18   something like that.

19   Q        There was an increase?

20   A        Oh, yes.

21   Q        And do you remember what you were making when

22   you concluded your job as a package truck driver with

23   UPS?

24   A        Approximately 28.

Thomas McBride

Page 19

```
 1   Q        And that's per hour?

 2   A        Excuse me?

 3   Q        Is that $28 per hour?

 4   A        Yes.

 5   Q        And the entire time you worked for UPS -- I may

 6   have asked this, so I apologize if I did -- you held the

 7   package truck driver role with UPS from 1991 through

 8   your termination, is that correct?

 9   A        Yes.

10   Q        I just wanted to make sure I got that right.

11   Thank you.

12            While you were employed with UPS -- and

13   we'll stick to the truck driver position going forward

14   unless I say otherwise -- were you, in fact, subject to

15   drug and alcohol testing?

16   A        Yes.

17   Q        And what types of tests were required of you?

18   A        What types of drug and alcohol tests?

19   Q        Yes.

20   A        Urine test.

21   Q        And did you have one before you became a

22   driver?

23   A        Yes.

24   Q        And were you subject to a random test?
```

Thomas McBride

1    **A**        **Yes.**

2    Q        Were there post-accident tests if you were to

3    have been involved in an accident?

4    **A**        **Were there?  You mean is that their rule or did**

5    **I have them?**

6    Q        Were there?

7    **A**        **Yes, that's a rule.**

8    Q        They have a post-accident testing policy?

9    **A**        **Yes.**

10   Q        And do they have a reasonable suspicion testing

11   policy?

12   **A**        **Yes.**

13   Q        And do they have follow-up and return to work

14   testing for people who may have violated their rules in

15   the past?

16   **A**        **Yes.**

17   Q        And you were aware of their drug and alcohol

18   testing policy how?

19   **A**        **Through the UPS handbook.**

20   Q        Is that something that was given to you as a

21   driver?

22   **A**        **Yes.**

23   Q        Do you have a copy of it now?

24   **A**        **I do not.**

Thomas McBride

Page 21

1    Q        What else was in the handbook?

2    **A        All rules of UPS and their employees and**

3    **Teamsters.**

4    Q        Is the UPS handbook with the rules for

5    employees and Teamsters, is that a UPS internal

6    publication or is it a collective bargaining agreement,

7    if you know?

8    **A        I'm not sure.  I do not know.**

9    Q        You mentioned the Teamsters.  Were you a member

10   of the Teamsters while you were with UPS?

11   **A        Yes.**

12   Q        And when did you join the union or become

13   covered by the union contract?

14   **A        I guess it's 90 days after you're first hired**

15   **as a part-time employee.  Everybody there is in the**

16   **union unless you're in management.**

17   Q        That's very helpful.  Thank you.  And so we

18   talked about the types of testing that the people who

19   work there may have been subjected to.  What sorts of

20   drug and alcohol tests were you subjected to that you

21   remember while you were there?

22   **A        Just urine tests, I guess.**

23   Q        Did you have a pre-hire test before you came

24   on?

**Thomas G. Oakes Associates**

Thomas McBride

Page 22

1    **A**        **I'm not sure about part-time.   Full-time, yes.**

2    Q        And were you ever subjected to a post-accident

3    test?

4    **A**        **I don't think I -- no.**

5    Q        And, as far as you know, were you ever pulled

6    aside where they said, hey, we'd like to send you for a

7    reasonable suspicion drug and/or alcohol test?

8    **A**        **No.**

9    Q        At some point, you became subject to follow-up

10   testing while employed by UPS.  Can you describe how

11   that came about?

12   **A**        **I went to classes.  I had the DUI, as I said to**

13   **you earlier, in Jersey.  And UPS sent me to their**

14   **program.  And I was subject to urine drug tests in that**

15   **program and then by UPS afterwards when I went back to**

16   **work.**

17   Q        Let me break that down a little bit.  So

18   following the DUI that you had in New Jersey, I gather

19   UPS became aware of that?

20   **A**        **Right.**

21   Q        And how did they become aware of that?

22   **A**        **I don't know.**

23   Q        Did you lose your license for a period of time?

24   **A**        **In New Jersey I did.  Six months.  But not in**

**Thomas McBride**

1    **PA.**

2    Q        That did not affect your ability to drive in

3    Pennsylvania?

4    **A        No.**

5    Q        Did you have a Pennsylvania or New Jersey

6    license at that time?

7    **A        Pennsylvania.**

8    Q        And as a result of that test, UPS, I think you

9    said, "put me in their program." Can you tell me a

10   little bit more about that? What did that mean for you?

11   **A        I was never aware of it, I guess. I talked to**

12   **my Teamsters and asked them what I should do. UPS sent**

13   **me to Keystone Crozer, I believe it is, for, I guess,**

14   **classes, they're called. They have a certificate. I**

15   **should have brought that in.**

16   Q        Classes on substance abuse or alcohol?

17   **A        Yes, drug and alcohol, it was.**

18   Q        Do you remember whether you were evaluated by

19   somebody to see what sorts of classes or treatment they

20   would have prescribed for you?

21   **A        I was evaluated by someone at Keystone.**

22   Q        And did they make recommendations for you?

23   **A        I'm not sure.**

24   Q        I think you said that you got put through the

**Thomas G. Oakes Associates**

Thomas McBride

Page 24

1    program.  And I'm a little unsure of the connection

2    between the person at Keystone who, I guess, met with

3    you and getting into the UPS program.  So I don't mean

4    to belabor things but just to try and better understand,

5    you went to see the Keystone person because somebody at

6    the Teamsters sent you?

7    **A        No, UPS had come to me.**

8    Q        Someone in management?

9    **A        Yes, someone in management.**

10   Q        And they asked you to go to see Keystone?

11   **A        They said they heard about the DUI or whatever**

12   **and they had to -- I guess it's their rules and**

13   **regulations that if you have a DUI, that you go through**

14   **their classes.  That's where they sent me, Keystone.**

15   Q        So the Keystone person met with you and you're

16   not aware whether they made any recommendations about

17   what sorts of classes you should --

18   **A        No, it's just a basic class.  They don't do an**

19   **evaluation and say he needs to go here or he needs to go**

20   **there.  You just go to the class.  They did ask me**

21   **questions and stuff like that, but --**

22   Q        Did you miss work during this time?

23   **A        No.**

24   Q        Were you driving in that period?

Thomas McBride

Page 26

1    Q        And did they call those follow-up tests at UPS?

2    **A**        **I'm not sure.**

3    Q        As far as you know, was the process for testing

4    the same?

5    **A**        **Same as?**

6    Q        As the testing that you had been subjected to

7    before.  Did anything change about how you were notified

8    to go for the test or the test that was performed?

9    **A**        **No.  They would call me in the morning and say**

10    **you need to go take a test before you come into work.**

11    Q        And the test was the same as the test, as far

12    as you know, that you had before?

13    **A**        **As far as I know.**

14    Q        Did you have to sign any sort of agreement with

15    UPS or the union about your return to work and testing?

16    **A**        **I don't recall.**

17    Q        I'm going to hand you a document and ask if you

18    recognize this.  Do you recognize that document?

19    **A**        **Do I recognize it?**

20    Q        Yes.

21    **A**        **No.**

22              MS. DELOGU:  I'm going to hand it to

23              the court reporter and ask him to mark it as

24              exhibit 1.

**Thomas G. Oakes Associates**

Thomas McBride

Page 27

1                    (Document marked for identification as

2            McBride exhibit 1.)

3    BY MS. DELOGU:

4    Q        If you could take a look at it.

5                    You took a minute to look it over.

6    Have you had a chance to review as much as you wanted to

7    of that document before I ask you a few questions?

8    **A        Sure.**

9    Q        Where it says employee's signature on the page,

10   is that your signature?

11   **A        Yes.**

12   Q        And there's something to the left of that that

13   looks like a date and some initials.  Are those also

14   your marks?

15   **A        It looks like it.  I'm not sure what it is.**

16   Q        I think it says 1/3/68, but I can't be sure.

17   That's not your birthday, is it?

18   **A        No.**

19   Q        And do you recognize the signature of the

20   person that's just over what's marked as SAP, slash,

21   treatment care professional?

22   **A        Do I recognize the name?**

23   Q        Yes.  Or can you read the signature?

24   **A        No.**

Thomas G. Oakes Associates

Thomas McBride

Page 32

1       conducted by his attorneys.  Just note my

2       objection to that.  Now, subject to that, if

3       you want to go through and ask him about each

4       one of these little subparagraphs, fine.  And

5       obviously he's going to answer.  But just note

6       my objection as to those questions.

7               MS. DELOGU:  Absolutely, absolutely.

8       I'm looking for personal knowledge he may have

9       about each of these allegations.  And I

10      understand there's also ongoing discovery that

11      may turn up other information.  Do I understand

12      the objection?

13              MR. BAIRD:  That's it completely.  And

14      I just didn't want to make the same objection

15      to the form for each one of these.  So I'm just

16      laying it out there now.

17              MS. DELOGU:  Absolutely.

18  BY MS. DELOGU:

19  Q       Mr. McBride, you said a few moments ago that

20  you believe that this complaint accurately and fully

21  represents the claims that you have in this suit.  And

22  what I'm asking you, the question is that's out there,

23  if you will, is what factual knowledge do you have, on

24  what basis do you believe that a proper chain of custody

Thomas McBride

1   of the drug test specimen was not followed?  Do you have

2   any personal knowledge about what might have happened to

3   the chain of custody?

4   **A        I would be guessing, my opinion.  I don't know**

5   **exactly.**

6   Q        That's fair.  The second item there on the

7   negligence count I is sub (b), which says that the

8   defendants were careless, reckless and/or negligent

9   because they failed to communicate with plaintiff --

10  that's you -- and the testing facilities, any and all

11  factors and/or agents which could or did affect the

12  testing process, including but not limited to your

13  pre-test dental procedure and related use of Septocaine.

14  My question to you is, are there any facts of which

15  you're aware to support the idea that the defendants

16  didn't communicate with you about your pre-test dental

17  procedure and the related use of Septocaine?

18  **A        I'm not sure what you're asking.**

19  Q        Well, let me rephrase the question.  You've

20  alleged here in paragraph 23 of the complaint that the

21  local anesthesia that you took contained Septocaine,

22  which you assert can trigger a false positive result on

23  a drug test for cocaine.  And the complaint alleges that

24  the fact that you had used this medication was not

Thomas G. Oakes Associates

Thomas McBride

Page 34

1  communicated.

2  **A      I guess if they had a checklist asking me if I**

3  **took something?  I don't know.**

4  Q      So you were not presented with a checklist?

5  **A      I guess they didn't know or ask me if I had**

6  **taken anything.**

7  Q      So, as far as you know, no one called and said,

8  gee, Mr. McBride, we've got a positive test here, did

9  you use Septocaine?

10  **A      Yes.**

11  Q      With respect to count I, sub (c), the

12  allegation that the defendant failed to ensure the

13  accuracy of the drug test.  You may have already

14  answered this, but is it your contention that the drug

15  test must have been inaccurate because you do not use

16  cocaine?

17  **A      Yes, it was inaccurate.**

18  Q      Sub (f) in the same count alleges that the

19  defendants were careless, reckless and/or negligent

20  because they did not conduct a pre-test interview to

21  rule out abnormalities which could and/or did influence

22  the test.  Correct?

23  **A      Correct.**

24  Q      Was it part of the UPS testing process to offer

Thomas McBride

1   you a pre-test interview at any time during your

2   employment there?

3   **A**       **Did UPS do a pre-test interview with me?**

4   Q       Well, you've testified that you were subject to

5   drug and alcohol testing as an employee of UPS from, if

6   I understood you correctly, from 1991 on.  And I'm

7   wondering if at any occasion, on any of the tests, you

8   were given a pre-test interview.

9   **A**       **No.**

10   Q       Do you have any personal knowledge about

11   carelessness, recklessness or negligent conduct of the

12   defendants that's related to your allegation that they

13   failed to maintain or cause to be maintained quality

14   control testing and/or reporting mechanisms and/or

15   protocols?

16   **A**       **Do I have --**

17   Q       Personal information about that.

18   **A**       **I don't know.  I'm not sure what you want me to**

19   **answer.**

20   Q       Well, the complaint alleges that the defendants

21   didn't do certain things, didn't maintain appropriate

22   quality control and didn't have appropriate reporting

23   mechanisms or protocols.  And I'm wondering, how did you

24   reach that conclusion.  You mentioned before that the

Thomas McBride

1    test was false, but did you have any personal

2    experience, did you experience anything in the course of

3    the testing process that led you to believe, other than

4    what you've already told us, which is that the test was

5    inaccurate, that there was some kind of quality control

6    problem or a lack of reporting mechanisms?

7    **A        As to -- what's it called?  Where I had taken**

8    **the urine test.**

9    Q        Yes.

10   **A        Yes, there was a lot of chaos in that office**

11   **and different people coming in and out.**

12   Q        So was that at the collection site where you

13   gave the specimen?

14   **A        Yes.**

15   Q        I'll ask you some more about that later.  Thank

16   you.  Was there anything that happened during the course

17   of the testing process, other than the chaos at the

18   collection site and the people coming in and out, that

19   you think is factually related to the outcome of the

20   drug test, something that you experienced or have

21   personal knowledge of?

22   **A        No.**

23   Q        So just to step back and go through things one

24   at a time, you returned to work following counseling and

Thomas McBride

1   meetings, I think you said, that were mandated by UPS

2   through Keystone.  And following your return to work,

3   you were subject to more frequent random drug testing?

4   **A        Yes.**

5   Q        Was that random drug and alcohol testing, Mr.

6   McBride?

7   **A        Yes.**

8   Q        Do you know why it was both?

9   **A        UPS's rule.**

10  Q        How many alcohol tests do you think you were

11  asked to take after you returned to work as a driver and

12  had completed the treatment we've already discussed?

13  **A        How many drug and alcohol tests?**

14  Q        How many alcohol?  Let's do that first.

15  **A        Approximately 20.**

16  Q        20?  And over what period of time?

17  **A        From the time I returned to work until I was**

18  **terminated.**

19  Q        Do you remember when you returned to work?

20  **A        No, I don't.**

21  Q        Was it a year, two years, six months?

22  **A        I thought I just took the test.  I don't know**

23  **when it was.**

24  Q        You don't remember, okay.  And with respect to

Thomas McBride

Page 41

1   each form.  Go ahead and take a look at that.  But my

2   copy has one that's marked 2/21/2008, one is marked

3   4/3/2008, one marked 10/30/08 and one marked 10/9/08.

4   Do you see that?

5   **A       Yes.**

6   Q       And each one appears to bear your signature.

7   But go ahead and tell me if you think that's wrong.

8   **A       No, I believe they're mine.**

9   Q       On this form, it says once you receive this

10  notification, report immediately to your designated

11  testing facility.  And then there is a collection site

12  given.  And each of them appears to be something called

13  Worknet in Lester, Pennsylvania.  Do you recall, is that

14  where you went to participate in the follow-up drug

15  testing?

16  **A       Yes.**

17  Q       Do you know whether any documents like this

18  exist in addition to the four pages that have been

19  marked collectively as exhibit 3?

20  **A       Do I know if there's more?**

21  Q       Yes.

22  **A       I do not.**

23  Q       Do you believe you received one of these for

24  each time you were asked to test?

Thomas G. Oakes Associates

Thomas McBride

Page 42

1    **A        I don't know.**

2    Q        Have you provided all documents in your

3    possession to your attorney that would relate to testing

4    notification?

5    **A        I believe so.**

6    Q        That's all the questions I have about that one.

7    So if you went to Worknet to produce a test sample, what

8    was the process?  How would that go once you got there?

9    **A        Get there and sign in.  I'd sign whatever**

10   **papers they would have me sign and wait to be called in**

11   **and go in and give my sample and a breathalyzer.**

12   Q        Was it always the breathalyzer first?

13   **A        I'm not sure.**

14   Q        But there was a breathalyzer test, I think you

15   said, at each time and also a urine specimen was

16   collected?

17   **A        Yes.**

18   Q        Were those collected with an observed

19   collection or non-observed collection?

20   **A        I'm not sure what that means.**

21   Q        When you were asked to produce a urine

22   specimen, were you provided privacy in the restroom?

23   **A        Yes.**

24   Q        Was the process of giving the breath specimen

Thomas G. Oakes Associates

Thomas McBride

1   and the urine specimen pretty much the same every time?

2   **A        Pretty much the same.**

3   Q        Was anything different that you recall about

4   the test you took on October 30, 2008?  And just to be

5   clear, October 30 is the test that the complaint alleges

6   came back with a false positive.

7   **A        Just being very hectic and chaotic in the**

8   **office that day.**

9   Q        When you say it was hectic and chaotic, do you

10  mean there were a lot of people waiting to give samples?

11  **A        There were a lot of people there.  I'm not sure**

12  **why they were there.  I think they have another section**

13  **to the Worknet maybe for rehab, rehabilitation for the**

14  **body, not for drugs.  I'm not sure if they were**

15  **short-staffed.  It was just very chaotic and hectic.**

16  Q        Did it take longer than usual?

17  **A        Yes.  It seemed like it.**

18  Q        Do you recall, when you gave your urine

19  specimen, was there a form that got completed to

20  document the collection?

21  **A        I'm not sure.**

22  Q        I've got some different copies of what are

23  titled custody and control form and I stapled them all

24  together.  And I think it would probably be easiest for

Thomas G. Oakes Associates

Thomas McBride

1    crossed off as a single specimen.  Is that correct?

2    **A        Yes, that's what it says here.**

3    Q        It says, "Collector affixes bottle seals to

4    bottles.  Collector dates seals.  Donor initials seals.

5    Donor completes step 5."  Do you remember being asked to

6    put your initials on the seals over your urine

7    collection?

8    **A        I do remember doing that during my tests.  I**

9    **don't recall if I did it every time but I do remember**

10   **doing that.**

11   Q        That was going to be my next question.  Do you

12   remember if there was anything different about this test

13   in that regard on the day when it was so busy?

14   **A        I don't remember.**

15   Q        And part 5, where it says completed by the

16   donor, you've already said that that's your information?

17   **A        Yes.**

18   Q        Was there anything else unusual other than the

19   extreme busy-ness and chaos that you remember on the

20   morning that your sample was collected that we've

21   already talked about, anything else you noted strange

22   about that particular collection on October 30?

23   **A        No.**

24   Q        What did you do after you gave your urine and

Thomas McBride

1    have you been anywhere where somebody would have put it

2    in your drink?  Or something else they asked me.  So

3    they did ask me something, it was just have you been

4    somewhere where they could have put it in your drink?

5    And I said I guess you could be anywhere and have them

6    put it in your drink.  I told them that could be, you

7    know.  There was something else they had asked me.  I'm

8    not sure.  It's been a while.

9    Q        It may come back to you later.  Let me know if

10   it does.

11                    What happened after you returned to --

12   well, I guess you said somebody came and you didn't

13   finish your route?

14   A        Right.

15   Q        What happened after that?

16   A        I went back to UPS.

17   Q        Did you have to meet with anyone?

18   A        Well, I met with my supervisor and my manager.

19   I don't recall if there was somebody there from the

20   Teamsters, like a business agent or something.  And

21   that's it.  I spoke with my supervisor and my manager.

22   They said I was a good employee there, so they were kind

23   of shocked themselves.  We just talked.  That was it.

24   They walked me out.

Thomas McBride

Page 50

1    Q        When they walked you out, were you suspended,

2    terminated?

3    **A        I was terminated at that point, I believe.**

4    Q        Did you get paperwork later on confirming your

5    termination?

6    **A        Later on I believe I did because the Teamsters,**

7    **I guess, tried to fight for my job back for UPS.  And**

8    **that was it.**

9    Q        And not to rush ahead there, but when the

10   Teamsters tried to fight for you to get your job back,

11   what did that consist of?

12   **A        You know, I'm not sure.  I wasn't there for any**

13   **of it.**

14   Q        Do you know if there was a hearing, for

15   example?

16   **A        I don't know.  If there was, I wasn't present.**

17   Q        And when you say you weren't present, is that

18   because you weren't invited to be present or you weren't

19   able to be present?

20   **A        I wasn't invited, no.  I'm not sure how that**

21   **whole thing works with the Teamsters and all that.  I**

22   **just kept in contact with somebody from the Teamsters**

23   **and they would tell me what was going on.**

24   Q        Well, did somebody at the Teamsters let you

Thomas McBride

1   know that they weren't going to change their mind over

2   at UPS or what do you recall about that?

3   **A        That is what I was told, that they just said**

4   **your job's terminated.**

5   Q        Did you try and push it any further, protest

6   that?

7   **A        No, I don't believe so.  I gave them the same**

8   **paperwork, that I was at the dentist.  I tried to think**

9   **of anywhere I could be, knowing that I didn't do it.  I**

10  **gave them my dentist's note and that was it.**

11  Q        Actually, let's talk about the dentist's note.

12  You went to the dentist, I guess, sometime proximate to

13  the test collection, correct?

14  **A        Correct.**

15  Q        And you had some procedure performed, I

16  believe?

17  **A        Yes.**

18  Q        Do you know whether you were administered any

19  medication or drugs while you were there at the dentist?

20  **A        Yes.**

21  Q        And, to your knowledge, what were you given?

22  **A        To my knowledge now, Septocaine.**

23  Q        And did your dentist tell you about that at the

24  time?

Thomas McBride

Page 52

1   **A**        **No.**

2   Q        Did you have some kind of --

3   **A**        **Well, I knew they were giving me something to**

4   **numb me up or whatever for the procedure.**

5   Q        What made you go to your dentist to get more

6   information?

7   **A**        **I believe after the test, when I heard about**

8   **the positive test, that I just thought of how could it**

9   **come back positive?  I believe I spoke with my wife at**

10  **the time and she says, well, it would have to be because**

11  **you went to the dentist.  So I called the dentist and**

12  **asked them what they gave me.  I got a note and provided**

13  **that to UPS.**

14  Q        Do you remember when you provided the note to

15  UPS?

16  **A**        **No, I don't.**

17  Q        I believe you provided that note to us.  Let me

18  see if I can get it out.

19              (Document marked for identification as

20              McBride exhibit 5.)

21  BY MS. DELOGU:

22  Q        Is this the note that you referenced, Mr.

23  McBride?

24  **A**        **Yes.  I thought there was more to it.**

Thomas McBride

Page 53

1    Q        Do you remember when you gave that note?  I

2    don't see a date.

3    **A        I don't remember.**

4    Q        Do you remember whether it was before or after

5    the termination of your employment?

6    **A        I'm sorry?  Excuse me?**

7    Q        Was it before or after you were terminated from

8    employment with UPS?

9    **A        Oh, this was after I was terminated.**

10   Q        And you say you provided it to your union rep?

11   **A        Union rep and UPS, I believe.**

12   Q        And I gather that the letter did not change

13   their mind about the termination?

14   **A        No.**

15   Q        Did your dentist tell you at any point that

16   Septocaine could cause a positive test result for

17   cocaine?

18   **A        Did they tell me that?**

19   Q        Yes.

20   **A        I don't think so.**

21   Q        Do you have any personal knowledge that, in

22   fact, Septocaine can cause a positive test result for

23   cocaine?

24   **A        Do I have that personal knowledge?  Did I know**

Thomas McBride

Page 54

1   that then?

2   Q        Do you know it now?

3   A        No.

4   Q        Well, do you believe that Septocaine can cause

5   a positive test for cocaine or were you concerned that

6   it might?

7   A        I was concerned that it might.  Like I said, my

8   wife at the time said have that checked out, see if that

9   was why.  Just trying to find a reason.

10  Q        Absolutely.  I understand.  Were there any

11  other medications that you were using at that time?

12  A        No.  When you say medications, do you mean

13  illegal medications?

14  Q        No, I meant legal medications.

15  A        No.  I was actually in training at the time, so

16  I don't know if like sports drinks or anything like

17  that --

18  Q        When you say training, you were working out a

19  little more?

20  A        Yes.  A lot more, yes.

21  Q        Training for anything in particular?

22  A        No.

23  Q        Do you recall, when somebody called you to tell

24  you that your drug test was positive, whether you

Thomas McBride

Page 56

1   **A**         **George Caroulis, yes.**

2   Q         I believe you mentioned that you knew that the

3   union had done something on your behalf.  And I'm going

4   to show you a document which I believe you and your

5   counsel produced to us.

6                     (Document marked for identification as

7                     McBride exhibit 7.)

8   BY MS. DELOGU:

9   Q         Let me know if you've seen that document

10  before.

11  **A**         **Yes.**

12  Q         And is this in the procedure that you were

13  referencing when you said the union did something on

14  your behalf?

15  **A**         **Yes.**

16  Q         And does the date look about right?

17  **A**         **Yes.**

18  Q         Do you remember when you were informed that

19  they were not going to change their decision?

20  **A**         **I don't remember, no.**

21  Q         I want to show you a document which I believe

22  was produced to you through the discovery process by

23  NDI, which is the National Diagnostics entity that I

24  represent.  I don't know whether you have seen this,

Thomas McBride

1   complaint about was, in fact, collected on 10/30/08 and

2   reported positive by NDI.  So I just want to make sure,

3   this is the test that you complained of in the amended

4   complaint, right?

5   **A        Yes.**

6   Q         There are some boxes checked and then below

7   that it says MRO note, 11/5, interviewed by Dr.

8   Theriault.  Do you remember being interviewed by anyone

9   at NDI and do you remember whether that individual

10  identified themselves as a doctor?

11  **A        I don't know if it was an interview.  It was, I**

12  **think -- I am not definite if this is the person who**

13  **called to let me know my results, if that's who this is.**

14  Q         Well, if I look below that page, contact

15  history, it indicates there was a call placed the day

16  before and it also states, "I scheduled an appointment

17  for the donor to speak with the MRO at 10:30 a.m. on

18  November 5.  I explained the consequences of the

19  doctor's declining to speak with the MRO or failure to

20  call back for this appointment, i.e., that the MRO will

21  verify the" -- that's nothing but an entry on a form.

22  It may or may not be correct.  But what I'm asking is,

23  when you review that, does that jog your memory at all?

24  Do you recall whether perhaps you were contacted the day

Thomas G. Oakes Associates

Thomas McBride

1    before and scheduled an appointment to speak to someone

2    the next day?

3    **A        Yes.  I believe they called to inform me of the**

4    **positive result.  And I don't know if it was that day or**

5    **the next day or what day it was that I spoke to someone**

6    **else, I'm not sure who it was, who had asked me about it**

7    **and, I guess, asked me some questions about it and why**

8    **it would come back positive.  Because I obviously was**

9    **putting up a fight on why it would come back positive.**

10   **And I think that they said they could do a retest.  I**

11   **said that would be great, but not realizing when they**

12   **were saying that, it would be a retest on the same urine**

13   **that I had given.  And I think they did that.  I said**

14   **yeah, absolutely, try anything.  I don't know what**

15   **that's going to do if it's the same urine.**

16   Q        It does say on contact history further down,

17   split ordered.  The labs were split ordered.  And then

18   above that, under MRO notes, it says, "11/24, donor

19   aware of retest results."  So it does look as though a

20   retest was ordered.  And do you recall getting a

21   follow-up call from anyone on that retest?

22   **A        I don't recall the phone call.  I'm sure they**

23   **did.**

24                   MR. BAIRD:  Don't guess.

Thomas G. Oakes Associates

Thomas McBride

1   **doctor or the dentist.   But I'm sure I could find out.**

2   Q       I believe you testified to this today, but

3   because the interrogatory is a little bit inconsistent,

4   I want to make sure I have the answer correct.   I

5   believe you testified that around the time of the drug

6   test, the only medical procedure you had was that trip

7   to the dentist.   Is that correct?

8   **A       That's correct, yes.   That's all I remember.**

9   Q       To the best of your recollection, you don't

10  remember taking any other kinds of medication at that

11  time?

12  **A       No.**

13          MS. DELOGU:  I have nothing further.  I

14          think we've identified some documents that we

15          are going to find and there may be other

16          documents that I didn't ask about that are in

17          the document production responses that I might

18          push back and say I haven't had a chance to go

19          through them.  But I can do that through your

20          counsel.

21          MR. BAIRD:  We'll get our hands on that

22          stuff as soon as possible of those items that

23          he's identified that he would look for and

24          we'll get you those.

Thomas G. Oakes Associates

Thomas McBride

Page 85

1             MS. DELOGU:  Thank you.  That obviously

2         helps us understand your claims better to have

3         those.

4             THE WITNESS:  Right.  That's fine.

5   BY MR. BAIRD:

6   Q       I just have a couple questions.  To your

7   understanding, why were you fired from UPS?

8   **A       For a drug test that came back positive.**

9   Q       And that test was for cocaine, right?

10  **A       Yes.  The test was for cocaine?  The positive**

11  **test.**

12  Q       The sample allegedly tested positive for

13  cocaine?

14  **A       Right.**

15  Q       Have you ever used cocaine before?

16  **A       No.**

17  Q       You testified about some treatment that you

18  had, substance abuse treatment.  What was the reason for

19  that treatment?

20  **A       For a prior DUI.**

21  Q       To your understanding, was that alcohol abuse

22  treatment?

23  **A       Yes.**

24  Q       And counsel asked you about exhibit 8.  It's an

Thomas G. Oakes Associates

856-869-3433                                    www.TGOakes.com

C E R T I F I C A T I O N

       I HEREBY CERTIFY that the foregoing is a true and correct transcript of the proceedings held in this matter, as transcribed from the stenographic notes taken by me on February 3, 2012.

BRAD TRATENBERG
Court Reporter - Notary Public

       (This certification does not apply to any reproduction of this transcript, unless under the direct supervision of the certifying reporter.)