IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

THOMAS MCBRIDE,                  : CIVIL ACTION
                                 : NO. 10-5737
    Plaintiff,                   :
                                 :
  v.                             :
                                 :
AMERICAN SUBSTANCE ABUSE         :
PROFESSIONALS, INC., et al.      :
                                 :
    Defendants.                  :

M E M O R A N D U M

EDUARDO C. ROBRENO, J.                     January 17, 2013

      Thomas McBride (Plaintiff) brings this action in negligence against National Diagnostics, Inc. (Defendant NDI). Defendant NDI moved for summary judgment. For the reasons that follow, the Court will grant the Motion for Summary Judgment (ECF No. 56).

I.    **BACKGROUND**[1]

      Plaintiff claims Defendant NDI was negligent in reviewing drug-test results regarding Plaintiff's urine sample. Defendant NDI confirmed a determination that the sample tested positive for cocaine, resulting in Plaintiff's termination.

---

[1] The Court states the following facts in the light most favorable to Plaintiff and draws all reasonable inferences in Plaintiff's favor.

1

Plaintiff is a resident of Chesterbrook, Pennsylvania, and a former United Parcel Service (UPS) package truck driver. He is currently unemployed. McBride Dep. 66:17-20, ECF No. 56-2, Feb. 3, 2012. Defendant NDI is a third-party administrator that provides comprehensive drug testing and medical review officer (MRO) services whose corporate headquarters are located in Charlotte, North Carolina. Compl. ¶ 5. On June 23, 2008, Defendant NDI entered into an agreement with UPS to provide MRO services in reviewing and reporting the results of UPS's employee drug tests to UPS. See NDI Substance Abuse Testing Services Agreement 1, 4.

Pursuant to the agreement, Defendant NDI performs these services in accordance with a collective bargaining agreement (CBA) between the Teamsters Local 623 Union, of which Plaintiff was a member during his employment, and UPS. Id. at 1; CBA art. 35, § 3.17. The CBA requires that UPS testing procedures be modeled on drug and alcohol testing regulations issued by the Department of Transportation for regulated transportation workers (DOT regulations):

> Because of the consequences that a positive test result has on an employee, UPS will employ a very accurate, two-stage program. Urine samples will be analyzed by a highly qualified independent laboratory which is certified by the Department of Health and Human Services. All samples will be tested according to DOT drug testing requirements. Validity testing for the presence of adulterants shall be conducted on all specimens, per HHS requirements.

CBA art. 35, § 3.2, Def.'s Mot. for Summ. J. Ex. B. Also relevant here, the CBA requires that an initial drug test, or "screening test," must use an "immunoassay" to determine levels of drugs or drug metabolites. The CBA additionally sets the threshold for a positive cocaine test at 300 nanograms per millilitre (ng/ml). Id. § 3.3. After the initial test, all specimens identified as positive must be confirmed using gas chromatography/mass spectrometry (GC/MS) techniques, and the CBA sets the positive test threshold for cocaine at 150 ng/ml. Id. § 3.4. Moreover, all drug-testing laboratories selected by UPS must be certified by the Department of Health and Human Services (HHS) and must comply with DOT regulations and the above-mentioned requirements. Id. § 3.5. Employee-testing procedures must be performed both pursuant to DOT-mandated random testing and as follow-up testing for post-drug and post-alcohol rehabilitation. Id. § 3.6.

Also required by the DOT, and, by extension, UPS and Defendant NDI, are the following: (1) a standard DOT-approved urine custody-and-control form supplied by the testing laboratory and signed by the employee and by handling agents at all collections facilities, id. § 3.14; (2) a Specimen Collection Checklist to be used with the affected employees at the collection site by the person collecting the urine sample from the employee, which checklist is

3

to be used at all locations, although "it is understood that failure to use or the refusal to use the checklist does not invalidate a properly conducted controlled substance testing procedure," id. § 3.15,; and (3) specimen containers that must be sealed and forwarded to an approved laboratory for testing, with the collector inspecting the sample and checking its temperature before sealing the sample container and placing a security label over the cap, which label is then signed by the employee, id. § 3.16; see also McBride Dep. 46:3-10. Specimen handling from one authorized individual or place to another must be conducted using chain-of-custody procedures. CBA art. 35, § 3.15.

The CBA also governs MRO procedures. It requires MROs to be a licensed doctor of medicine or osteopathy with knowledge of substance abuse disorders, issues relating to adulterated and substituted specimens, possible medical causes of specimens having an invalid result, and applicable DOT regulations. Id. § 3.17. Furthermore, MROs must keep current on DOT regulations and comply with the DOT qualification training and continuing education requirements. MRO responsibilities includ the following: (1) Reviewing the results of UPS's drug testing program; (2) receiving all positive and negative drug test reports as prescribed under DOT regulations and making all reports of drug test results to employers; (3) within a reasonable time, notifying an employee of a confirmed

4

positive test result; (4) reviewing and interpreting each confirmed positive test result in order to determine if there is an alternative medical explanation for the specimen's testing positive; and (5) processing an employee's request to re-test the sample, which must be made within 72 hours of receipt of actual notice of a positive test result.[2] Id.

The MRO must perform the following functions as part of the review of a confirmed positive test result: (1) Provide an opportunity for the employee to discuss a positive test result; (2) review the employee's medical history and relevant biomedical factors; (3) review all medical records made available by the employee to determine if a confirmed positive test resulted from legally prescribed medication or other possible explanations; and (4) verify that the laboratory report and assessment are correct. Id. If the MRO determines, after appropriate review, that there is a legitimate medical explanation for the confirmed positive test result, the MRO shall report the test to the employer as a negative. Id. § 3.18. If, however, the MRO determines that there is no legitimate medical explanation, he or she must report the positive test result to the employer in accordance with DOT regulations. Id.

---

[2] At the employee's request, a second specimen of the urine sample must be forwarded by the initial testing laboratory to an independent and unrelated HHS-approved laboratory for a GC/MS confirmatory testing of the presence of the drug. Id. § 3.15.

The relevant timeline of events in the case at hand is as follows. In 1991, Plaintiff began working full-time as a delivery driver for UPS. McBride Dep. 14:7-8. Plaintiff was provided with a copy of UPS's drug-testing policy and was familiar with the procedures listed above. Id. at 20:17-22. As a requirement of employment, Plaintiff was subject to random drug and alcohol tests. Id. at 19:24-20:1. In June 2007, Plaintiff was cited for and subsequently convicted of driving while intoxicated in New Jersey. Id. at 11:20-12:8; see also Order & Certification, June 10, 2007. As a result, Plaintiff's driving privileges were suspended in New Jersey for six months. McBride Dep. 22:24.

UPS soon learned of Plaintiff's DWI conviction, placed him on probation, and required him, as a condition of further employment, to enter into a rehabilitation agreement wherein he agreed to voluntarily submit to unannounced drug and alcohol tests. Id. at 23:24-25:20; Def.'s Mot. for Summ. J. Ex. D. These included both breathalyzer and urine tests, provided simultaneously at each visit to a testing center. McBride Dep. 42:6-14. By signing the agreement, Plaintiff acknowledged that a future positive test result would result in the termination of his employment. Def.'s Mot. for Summ. J. Ex. D. During his probation, Plaintiff submitted to approximately twenty random tests—all of which came back negative for drugs and alcohol. McBride Dep. 37:14-38:13.

On October 30, 2008, Plaintiff reported to the Worknet testing facility in Lester, Pennsylvania, where he normally went to participate in testing. Id. at 41:9-16, 42:14-17. On that day, Worknet was busier than usual and it took Plaintiff longer than he expected to complete the test. Id. at 43:3-17, 46:18-23. However, he did not experience any problem with the collection process. Id. at 46:8-23. After providing a urine sample, Plaintiff signed a custody and control form, which states:

> I certify that I provided my urine to the collector; that I have not adulterated it in any manner; each specimen bottle used was sealed with a tamper-evident seal in my presence; and that the information provided on this form and on the label affixed to each specimen is correct.

Def.'s Mot. for Summ. J. Ex. E, Custody & Control Form. Plaintiff also put his initials on the seal covering his urine sample. McBride Dep. 46:3-10.

After Plaintiff submitted his urine sample, UPS delivered it to Advanced Technology Network (ATN) to perform drug testing. Theriault Dep. 11:6-10; 12:16-20. ATN is certified by the Substance Abuse and Mental Health Services Administration (SAMSA) to perform DOT-regulated tests such as those required by UPS. Id. at 16:19-17:18. ATN tested Plaintiff's urine sample and concluded that cocaine metabolites were present. Def.'s for Mot. Summ. J. Ex. G, Test Results. Specifically, Plaintiff's urine included 1065 ng/mL of cocaine metabolites, far exceeding either the 300 ng/mL screen

7

cutoff or 150 ng/mL GC/MS cutoff set by the CBA. Id. Thus, ATN reported Plaintiff's test as positive for cocaine. Id.

ATN then forwarded Plaintiff's test results to Defendant NDI for review. Theriault Dep. 13:1-13. Dr. Elaine Theriault was the MRO who reviewed Plaintiff's positive result. Id. at 26:7-10. Dr. Theriault first reviewed the chain-of-custody form and confirmed that Plaintiff's urine specimen was collected, labeled, sealed, and released to ATN in accordance with the CBA and DOT regulations. Id. at 22:3-18; see also Custody & Control Form. She then reviewed ATN's test results, which were signed by a certifying scientist, confirming that Plaintiff's urine sample was examined, handled, analyzed, and reported by ATN in accordance with DOT-regulated testing requirements. Theriault Dep. 21:9-12; Test Results.

After confirming that the chain of custody was not broken and that the drug test was positive, Dr. Theriault contacted Plaintiff by telephone to discuss the results with him. McBride Dep. 58:6-59:8; Theriault Dep. 27:1-14. Tara Male, an MRO assistant, was also on the line and took notes during the interview, which were then recorded onto an MRO Verification Interview Worksheet (Worksheet). Theriault Dep. 26:13-27:14; Def.'s Mot. for Summ. J. Ex. L., Worksheet. Dr. Theriault asked him for information that might explain the positive test result. Plaintiff responded that he had undergone a dental procedure five days before the drug test. She also asked

him if it were possible that someone could have slipped cocaine into his food or drink, and he agreed.[3]

After her discussion with Plaintiff, Dr. Theriault considered his explanations and systematically ruled them out as possibilities for the positive result. She determined that any substance ingested during the dental procedure would not have produced a positive result because cocaine metabolites can only be detected in urine within 72 hours of cocaine use. Theriault Dep. 28:14-18. This observation applied whether, during the procedure, Plaintiff was administered cocaine or some sort of derivative. Id. at 84:9-12. Furthermore, she determined that no medication would have caused a positive test result—the only substance that would trigger a positive result is cocaine itself. Id. at 29:23-30:15. Because the dental procedure occurred outside the 72-hour period, Dr. Theriault ruled out Plaintiff's dental procedure as a justification for his positive test result.[4]

---

[3] Dr. Theriault recalled, and Ms. Male confirmed in her notes, that Defendant NDI admitted to using cocaine "several months prior to the urine drug screen." Theriault Dep. 27:17-19; Worksheet 3. However, Plaintiff denies making the admission and denies ever knowingly using cocaine. McBride Dep 60:11-17; 85:15-16. As there is a fact issue regarding the alleged statement, the Court will not consider it.

[4] In his Second Amended Complaint, Plaintiff alleged that Defendant NDI failed to consider the presence of Septocaine, a local anesthetic given to Plaintiff during his dental procedure, as a factor improperly influencing the drug test result. Second Am. Comp.

As for the possibility that Plaintiff unintentionally ingested cocaine within the 72-hour period prior to the test, Dr. Theriault said that she still would have reported the test as positive, because, according to the CBA and DOT regulations, unknowing use is not a legitimate medical explanation for a positive result. Id. at 29:16-18; see also 49 C.F.R. § 40.151 (2012). After ruling out all Plaintiff's explanations, Dr. Theriault verified Plaintiff's test result as positive for cocaine. Id. 30:20-22; Worksheet 1.

During the conversation with Plaintiff, Dr. Theriault offered him the opportunity to have his sample retested by a second laboratory to ensure accuracy. Theriault Dep. 34:19-35:2. Plaintiff requested the retest, and NDI directed ATN to forward the sample to Laboratory Corporation of America (LabCorp), also a SAMHSA-certified testing center, to conduct the retest. Id. LabCorp confirmed that Plaintiff's sample tested positive for cocaine. Id. LabCorp Test Result, Def.'s Mot. for Summ J. Ex. N. After Defendant NDI received the results, a representative reported the positive retest to Plaintiff. Theriault Dep. 36:1-5. Defendant NDI also reported the positive test results from both labs to UPS, Theriault Dep. 47:23-48:3-5, and on November 5, 2008, UPS terminated his employment.

---

¶ 23. However, Dr. Theriault concluded that Septocaine cannot cause a false-positive result, Theriault Dep. 28:17-18, and Plaintiff agrees with that determination. See Pl.'s Resp. 3.

McBride Dep. 50:1-3.

**II. PROCEDURAL HISTORY**

After Plaintiff's union unsuccessfully grieved his discharge through the procedure set forth in the CBA, he then filed a complaint in this court against UPS and American Substance Abuse Professionals(ASA)on October 28, 201. On January 20, 2010, ASA submitted their answer along with affirmative defenses. On March 8, 2011, the Court granted UPS's Motion to Dismiss with prejudice, as Plaintiff did not oppose. On March 25, 2011, the Court granted Plaintiff's request to file an amended complaint to include Defendant NDI. Plaintiff and ASA then stipulated to dismissing ASA on February 3, 2012. Therefore, Defendant NDI is the only remaining defendant in this case. On June 13, 2011, Defendant NDI filed a Motion to Dismiss, and the Court granted it with leave to amend the complaint to clarify Plaintiff's negligence claims. His second amended complaint was filed on September 19, 2011, and Defendant NDI promptly answered. After almost a year of discovery, Defendant NDI filed the present motion for summary judgment. Plaintiff responded, and Defendant NDI replied. The matter is now ripe for disposition.

**III. LEGAL STANDARD**

Summary judgment is appropriate if there are no genuine

disputes of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). "A motion for summary judgment will not be defeated by 'the mere existence' of some disputed facts, but will be denied when there is a genuine issue of material fact." Am. Eagle Outfitters v. Lyle & Scott Ltd., 584 F.3d 575, 581 (3d Cir. 2009) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986)). A fact is "material" if proof of its existence or nonexistence might affect the outcome of the litigation, and a dispute is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson, 477 U.S. at 248.

The Court will view the facts in the light most favorable to the nonmoving party. "After making all reasonable inferences in the nonmoving party's favor, there is a genuine issue of material fact if a reasonable jury could find for the nonmoving party." Pignataro v. Port Auth. of N.Y. & N.J., 593 F.3d 265, 268 (3d Cir. 2010). While the moving party bears the initial burden of showing the absence of a genuine dispute of material fact, meeting this obligation shifts the burden to the nonmoving party who must "set forth specific facts showing that there is a genuine issue for trial." Anderson, 477 U.S. at 250.

Federal courts sitting in diversity generally apply substantive state law. See Erie R.R. Co. v. Tompkins, 304 U.S. 64,

78 (1938). Here, the parties rely on Pennsylvania law in their written submissions to the Court, which indicates their agreement that Pennsylvania law governs Plaintiff's negligence claims. Therefore, the Court will apply Pennsylvania law in this case. See Advanced Med., Inc. v. Arden Med. Sys., Inc., 955 F.2d 188, 202 n.8 (3d Cir. 1992).

**IV. DISCUSSION**

Defendant NDI moves for summary judgment on all Plaintiff's claims. For the reasons that follow, the Court will grant the motion as to all claims.

In his claim for negligence, Plaintiff alleges that Defendant NDI's potentially negligent conduct includes: (1) failing to ensure a proper chain of custody of the subject specimen; (2) failing to communicate with Plaintiff and the testing facilities any and all factors which could or did affect the testing; (3) failing to take into account and eliminate any and all factors which may improperly influence the tests; (4) failing to prevent testing results of and/or reporting of a "false-positive"; (5) failing to pre-test interview Plaintiff to rule out abnormalities which could and/or did influence the tests; (5) failing to maintain and/or cause to be maintained appropriate quality-control testing and/or reporting mechanisms and/or protocols; (6) failing to comply with governing procedures, regulations, protocols, and/or laws

13

concerning reporting and/or testing; and (7) failing to monitor and/or control others' compliance. Second Am. Compl. 4.

In his Response to Defendant NDI's Motion for Summary Judgment, Plaintiff argues that, although he has not put forth sufficient direct evidence, the doctrine of res ipsa loquitur nevertheless permits him to establish a negligence claim. Pl.'s Resp. 2-5, ECF No. 60. He further argues that Defendant NDI's primary piece of evidence, Dr. Theriault's deposition, should be excluded because it is hearsay and she does not qualify as an expert. Id. 5-8.

Plaintiff relies on res ipsa loquitur as a saving grace to preserve his claims. He argues that the Court must accept his testimony that he did not use cocaine before testing positive, and that, therefore, the test must necessarily be a false positive permitting an inference of negligence. This argument fails because Plaintiff has not demonstrated that his injury does not normally occur absent negligence and that all other reasonable causes of the injury have been eliminated.

Res ipsa loquiter, meaning "the thing speaks for itself," is a rule of evidence whereby a plaintiff may advance his negligence case even though the evidence is insufficient to establish the elements of negligence. Instead of directly proving these elements, the Plaintiff "proceeds by providing facts and circumstances surrounding the injury that make an inference of the defendant's

negligence reasonable." Soufflas v. Zimmer, 474 F. Supp. 2d 737, 754 (E.D. Pa. 2007) (citing Togwood v. Owen J. Rogal, DDS, P.C., 824 A.2d 1140, 1146 (Pa. 2003)). Although usually serving as an inference upon which the jury may rely, courts may apply it in analyzing motions for summary judgment. See Soufflas, 474 F. Supp. 2d at 754; Parkinson v. Guidant Corp., 315 F. Supp. 2d 741, 750 (W.D. Pa. 2004).

A plaintiff must satisfy three elements in order to permit the Court to infer without sufficient direct evidence that Defendant NDI caused Plaintiff's harm: (1) the event is of a kind which ordinarily does not occur in the absence of negligence; (2) other responsible causes, including the conduct of the plaintiff and third persons, are sufficiently eliminated by the evidence; and (3) the indicated negligence is within the scope of the defendant's duty to the plaintiff. Quinby v. Plumsteadville Family Practice, Inc., 907 A.2d 1061, 1071 (Pa. 2006) (quoting Restatement (Second) of Torts § 328D (1965)).

As to the first element, Plaintiff, relying only on his deposition testimony, cannot establish that his drug test result was not of a kind which ordinarily does not occur absent negligence. To determine whether a nonmoving party's deposition testimony alone is insufficient to withstand summary judgment, the assertions must be compared to the other evidence of record to determine whether they are "sufficient for a rational factfinder to credit the plaintiff's

testimony, despite its self-serving nature." Johnson v. MetLife Bank, N.A., No. 11-800, 2012 WL 3194405, at *5 (E.D. Pa. Aug. 7, 2012) (citing Gonzalez v. Sec'y of the Dep't of Homeland Sec., 678 F.3d 254, 263 (3d Cir. 2012)).

There are two scenarios wherein res ipsa loquiter applies. The first are situations that are inherently of the type which do not occur absent negligence. In these extreme cases, a plaintiff need not put forth any direct evidence to satisfy the doctrine's first element. Examples include a mysterious falling barrel, Byrne v. Boadle, 2 H. & C. 722 (Exch. 1863), a rag mistakenly left inside a surgery patient, Coleman v. Rice, 706 So. 2d 696 (Miss. 1997), and "a human toe in the plug of chewing tobacco," Quinby, 907 A.2d at 1076 (quoting William L. Prosser, Torts 212 (2d ed. 1955)).

The second scenario involves situations that may occur absent negligence, but a specific issue in a plaintiff's case changes the situation from the norm so that it cannot occur without negligence. The fact that a particular specimen is reported as positive for illegal drugs does not itself suggest the occurrence of negligence. But if a plaintiff were to point to evidence that the drug-test result, although positive, would necessarily have to be the consequence of an adulterant, for example, because it is physically impossible for a living human being to produce such high levels of the relevant substance, then the test result "speaks for

16

itself" that negligence was necessarily involved. See Edwin C. Tan, NTSB Order No. EA-5032, 2003 WL 1611414 (March 2003).

The present case falls into this second variation of res ipsa loquiter and thus Plaintiff is obligated to submit some evidence that his specific drug test deviated from the norm. That his last twenty drug-test results were negative is not sufficient to cast doubt on the latest result, because Plaintiff has not shown that the urine samples tested in the prior twenty tests were identical to the urine sample which produced the positive result. This is true particularly in light of the other evidence that shows Defendant NDI followed all regulations in reviewing the result and communicating with him. Therefore, Plaintiff has failed to show his drug test does not normally occur absent negligence.

Additionally, Plaintiff has failed to rule out other reasonable causes of the injury. In the telephone conversation with Dr. Theriault to discuss the results of the drug test, he admitted that someone could have slipped cocaine into his food or drink, causing him to ingest the substance unknowingly. McBride Dep. 48:13-49:7. He has also failed to account for the actions of those not within Defendant NDI's control, such as the collection facility or either of the two independent testing labs. Therefore, res ipsa

loquitur cannot save him from summary judgment.[5]

---

[5] In Plaintiff's reply brief, and for the first time, he argues that: (1) given that Plaintiff contends he did not use cocaine, the positive result is proof of Defendant NDI's negligence under the principle of res ipsa loquitur based on the testimony of Dr. Theriault; and (2) at the same time, that the testimony of Dr. Theriault should be excluded as either unqualified expert opinion or inadmissible hearsay. His arguments are, of course, contradictory. Plaintiff cannot both seek to exclude Dr. Theriault's testimony, which he himself elicited at deposition, while also relying upon it to show negligence on the part of Defendant NDI.

Be that as it may, these arguments, considered independently, have no merit. First, as discussed above, res ipsa loquitur is not available to Plaintiff in this case. Second, Dr. Theriault's role in this case is both as a fact witness and as an expert. As a fact witness, her role is to describe how the Defendant NDI complied with the provisions of the CBA dealing with testing and with DOT regulations. This she did, and Plaintiff apparently does not dispute the accuracy of her testimony on this point. To the extent that Dr. Theriault's testimony explained her method of and reasons for excluding other possible causes of the positive test result, this does constitute "expert testimony" (which Plaintiff himself elicited). However, the testimony is admissible in that Dr. Theriault, by virtue of education and experience, is qualified to render an opinion in the field of drug-testing analysis, based on facts and data of record in this case. This opinion is reliably based upon DOT regulations and it fits the facts of the case. See Fed. R. Evid. 702; In re Paoli R.R. Yard PCB Litigation, 35 F.3d 717, 751 (3d Cir. 1994) (holding that, under Rule 702, a witness may qualify as an expert if three requirements are satisfied: (1) the witness must have "sufficient knowledge, skills, and training in the relevant field"; (2) the testimony must be the product of reliable principles and methods; and (3) the testimony must fit the facts of the case so that it assists the trier of fact).

Ultimately, Plaintiff's claim appears to be that the independent drug-testing laboratories were negligent in processing Plaintiff's urine sample, resulting in a false positive. Plaintiff, however, chose not to pursue these potential defendants, and, having failed to do so, cannot turn the instant Defendant NDI into an insurer of any negligence which may have been committed by the independent labs.

**IV. Conclusion**

For the foregoing reasons, the Court will grant the Motion for Summary Judgment.